**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| WYOMING REFINING COMPANY,<br><br>        Petitioner,<br><br>    v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>        Respondent. | Case No. 25-1240 |

## PETITION FOR REVIEW

Pursuant to Section 307(b) of the Clean Air Act, 42 U.S.C. § 7607(b), and Federal Rule of Appellate Procedure 15(a), Petitioner Wyoming Refining Company ("Wyoming") respectfully petitions this Court for review of the final actions of the Administrator of the United States Environmental Protection Agency ("EPA") issued on August 22, 2025, titled "August 2025 Decisions on Petitions for RFS Small Refinery Exemptions" (attached as Exhibit A), and its decisions on Wyoming's petitions for small-refinery hardship relief for the 2019, 2020, 2021, 2022, 2023, and 2024 compliance years (at Appendix PP to Exhibit A).*

Notice of EPA's August 2025 actions was published in the Federal Register on August 27, 2025. 90 Fed. Reg. 41829 (Aug. 27, 2025)

---

*The refinery-specific "Appendix PP" attached to this EPA Decision Document contains Confidential Business Information ("CBI") protected under 40 C.F.R. §§ 2.201–215 and is not included in Exhibit A at this time.

(attached as Exhibit B). This Petition is timely filed within 60 days of the notice published in the Federal Register. See 42 U.S.C. § 7607(b)(1).

The Corporate Disclosure Statement required by Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1 is attached as Exhibit C.

Dated: October 27, 2025

Respectfully submitted,

*s/ Michael R. Huston*

LeAnn Johnson Koch
Alexandra Magill Bromer
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: 202.654.6297
Facsimile: 202.654.6211
Leannjohnson@perkinscoie.com
ABromer@perkinscoie.com

Michael R. Huston
Karl J. Worsham
PERKINS COIE LLP
2525 East Camelback Road, Suite 500
Phoenix, AZ 85016
Telephone: 602.351.8000
Facsimile: 602.648.7000
MHuston@perkinscoie.com
KWorsham@perkinscoie.com

Attorneys for Wyoming Refining Company

# EXHIBIT A

# August 2025 Decisions on Petitions for RFS Small Refinery Exemptions



United States
Environmental Protection
Agency

# August 2025 Decisions on Petitions for RFS Small Refinery Exemptions

U.S. Environmental Protection Agency

NOTICE

This technical report does not necessarily represent final EPA decisions or positions. It is intended to present technical analysis of issues using data that are currently available. The purpose in the release of such reports is to facilitate the exchange of technical information and to inform the public of technical developments.


United States
Environmental Protection
Agency

EPA-420-R-25-010
August 2025

# Table of Contents

I. Executive Summary ................................................................................................... 1

II. Background ............................................................................................................... 2

III. EPA Evaluation ....................................................................................................... 6

   A. Eligibility ........................................................................................................... 6

   B. Ineligibility Determinations ............................................................................... 6

   C. SRE Petition Requirements ................................................................................ 8

   D. DOE Consultation .............................................................................................. 8

   E. Meaning of Disproportionate Economic Hardship ............................................ 9

   F. RIN Cost Passthrough ...................................................................................... 10

   G. EPA's Response to the Final GAO Report ...................................................... 13

   H. Authority to Find Partial Disproportionate Economic Hardship .................... 13

IV. Implementation ...................................................................................................... 20

   A. RIN Return ....................................................................................................... 20

   B. Legal Authority ................................................................................................ 20

   C. Reporting Requirements ................................................................................... 22

V. Final Action on Petitions ........................................................................................ 23

VI. Judicial Review ...................................................................................................... 23

VII. Update on Status of Certain SRE Petitions ......................................................... 28

# I.    Executive Summary

In this document, the U.S. Environmental Protection Agency ("EPA" or "the Agency") is acting on 175 individual small refinery exemption ("SRE") petitions from 38 refineries seeking an exemption from their Renewable Fuel Standard ("RFS") obligations for the 2016–2024 compliance years.[1] In consultation with the U.S. Department of Energy ("DOE"), EPA reviewed all the information submitted by each individual refinery in support of its petition. After careful consideration of all statutory factors and the information submitted by the refineries, EPA is granting full exemptions to 63 petitions (36 percent), granting partial exemptions to 77 petitions (44 percent), denying 28 petitions (16 percent), and determining seven petitions to be ineligible (4 percent). The decisions break down as follows:

| Compliance Year | Total Exempted RVO (million RINs) | Petitions | Full (100%) Exemption | Partial (50%) Exemption | Denial | Ineligible |
|---|---|---|---|---|---|---|
| 2016 | 0 | 1 | 0 | 0 | 1 | 0 |
| 2017 | 0 | 1 | 0 | 0 | 1 | 0 |
| 2018 | 60 | 10 | 0 | 3 | 7 | 0 |
| 2019 | 1,460 | 29 | 25 | 4 | 0 | 0 |
| 2020 | 770 | 30 | 7 | 17 | 6 | 0 |
| 2021 | 910 | 24 | 15 | 6 | 1 | 2 |
| 2022 | 760 | 24 | 6 | 14 | 3 | 1 |
| 2023 | 680 | 26 | 6 | 15 | 4 | 1 |
| 2024 | 710 | 30 | 4 | 18 | 5 | 3 |
| **Total** | **5,340** | **175** | **63** | **77** | **28** | **7** |

Note: This table summarizes the SRE decisions we are making in this document. It does not represent all SRE decisions for each year. For a full list of SRE decisions by year, see https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rfs-small-refinery-exemptions.

This document articulates EPA's interpretation of section 211(o)(9) of the Clean Air Act ("CAA" or "the Act") and EPA's authority with respect to SRE petitions. This document also includes confidential, refinery-specific appendices that address information raised by the refineries in their petitions.[2] These appendices also include refinery-specific information provided by DOE. As required by CAA section 211(o)(9), EPA's final actions on the pending

---

[1] In this document, we are not deciding pending SRE petitions for the 2025 compliance year. EPA guidance suggests that a small refinery submit three quarters of financial data for the year for which the refinery is seeking an exemption. Petitioners are unable to provide this data until at least October 2025. *See* "Financial and Other Information to Be Submitted with 2016 RFS Small Refinery Hardship Exemption Requests," December 6, 2016, available at https://www.epa.gov/sites/default/files/2016-12/documents/rfs-small-refinery-2016-12-06.pdf.

[2] The refinery-specific appendices contain information claimed by the small refineries to contain confidential business information (CBI). Under CAA section 114(c), and 40 CFR Part 2, Subpart B, Confidentiality of Business Information, EPA cannot publicly release information claimed as CBI unless EPA has determined that the information is not entitled to confidential treatment. 40 CFR §§ 2.204, 2.205, 2.208. EPA has not yet made a CBI determination for this information; therefore, EPA has not made the refinery-specific appendices publicly available.

SRE petitions are based on the legal and factual analysis presented herein, after consulting with DOE, and considering the DOE Small Refinery Study and "other economic factors."

This document also explains how EPA will implement SRE decisions when an exemption is granted. In addition, this document articulates the status of 34 SRE petitions from 31 refineries for the 2016–2018 compliance years.

## II. Background

CAA section 211(o)(9)(B) authorizes the EPA Administrator to temporarily exempt small refineries from their renewable fuel volume obligations under the RFS program "for the reason of disproportionate economic hardship" ("DEH"). The statute directs EPA, in consultation with DOE, to consider two things when evaluating SRE petitions: the DOE Small Refinery Study[3] and "other economic factors." The statute does not define "disproportionate economic hardship," provides no direction on how EPA is to consider the DOE Small Refinery Study, and identifies no particular "economic factors" to be considered when assessing DEH.[4]

The CAA defines a small refinery as "a refinery for which the average aggregate daily crude oil throughput for a calendar year . . . does not exceed 75,000 barrels."[5] Both the original RFS statutory provisions enacted pursuant to the Energy Policy Act of 2005 (EPAct)[6] and the current text of the CAA as amended by the Energy Independence and Security Act of 2007 (EISA)[7] provided all small refineries an initial blanket exemption from their obligations under the RFS program until calendar year 2011.[8] By regulation, EPA required small refineries that were producing either "gasoline" under the initial RFS program (RFS1)[9] or "transportation fuel" under the RFS program as modified by EISA (RFS2)[10] to notify the Agency that they qualified for the temporary exemption by submitting verification letters stating their average crude oil throughput rate during the applicable qualification period.[11]

---

[3] "Small Refinery Exemption Study, An Investigation into Disproportionate Economic Hardship," Office of Policy and International Affairs, U.S. Department of Energy, March 2011 ("2011 DOE Study").

[4] *Sinclair Wyo. Ref. Co. LLC. v. EPA*, 114 F.4th 693, 707 (D.C. Cir. 2024) ("*Sinclair IV*") ("We previously affirmed EPA's broad discretion to consider a range of factors when deciding hardship petitions."); *Hermes Consol., LLC v. EPA*, 787 F.3d 568, 574–75 (D.C. Cir. 2015) ("*Hermes*") ("The statute . . . contains no definition of the term 'disproportionate economic hardship'. . . . Congress required EPA to consult with DOE and to 'consider the findings of the [2011 DOE Study] and other economic factors' when evaluating petitions. The statute gives no further instruction and identifies no particular economic factors or metrics to be considered.")).

[5] CAA section 211(o)(1)(K). Thus, a "small refinery" is determined based on the annual volume of crude oil processed at the refinery, not on the size of the company that owns the refinery. Indeed, many "small refineries" are owned by large multi-national companies.

[6] Pub. L. No. 109-58, 119 Stat. 594.

[7] Pub. L. No. 110-140, 121 1492.

[8] CAA section 211(o)(9)(A)(i).

[9] 72 FR 23900 (May 1, 2007), 40 CFR 80.1141(a)(1) (2021).

[10] 75 FR 14670 (March 23, 2010), 40 CFR 80.1441(a)(1) (2021).

[11] 72 FR 23900, 23924 (May 1, 2007), 40 CFR 80.1141(b); 75 FR 14670, 14735-38 (March 23, 2010), 40 CFR 80.1441(b). EPA's regulations allowed for small refineries that had submitted verification letters to qualify for the original statutory exemption under EPAct / RFS1 to also qualify under the SRE provisions in EISA / RFS2. The small refineries were not required to re-certify their throughput to maintain eligibility under the RFS2 program.

The CAA includes two additional provisions regarding extensions of the SRE for the period after the initial blanket exemption expired:

1) Under the first statutory mechanism, applicable to 2011 and 2012, if DOE determined, through a study mandated under the CAA, that compliance with the RFS requirements would impose DEH on a small refinery, EPA was required to "extend the exemption . . . for the small refinery" for at least two years.[12] DOE completed its study in 2009, finding that, given each refinery's proportional obligations under the program, and the opportunity to comply with RFS obligation by blending or purchasing RINs, in a liquid and competitive Renewable Information Number (RIN) market, compliance with the RFS requirements would *not* impose DEH on any small refinery.[13] Subsequently, Congress, in report language, directed DOE to revisit the 2009 DOE Study and in so doing to solicit input from small refineries.[14]

   In 2011, DOE completed a second study that used the small refinery input to develop a set of financial and operational metrics intended to inform DOE whether a small refinery was likely to experience DEH.[15] Contrary to the 2009 DOE Study, the 2011 DOE Study did not assume that RFS compliance costs would be the same for all refineries in a competitive market, but instead assumed that small refineries could face higher compliance costs by purchasing RINs when compared to large integrated refiners that would acquire RINs through blending. DOE organized the metrics into a two-part matrix with sections addressing "disproportionate impacts" and "viability impairment" (the "DOE matrix" or simply "the matrix"). DOE also developed a scoring protocol for the matrix that required the score in both sections of the matrix to exceed an established threshold for DOE to find that DEH existed at a given small refinery. Using this regime, the 2011 DOE Study found that DEH existed at 14 small refineries. As required by the CAA, EPA granted those small refineries a two-year extension of the initial blanket exemption (through 2012).[16]

2) The second statutory mechanism provided that small refineries "may at any time petition the Administrator for an extension of the exemption under [section 211(o)(9)(A)] for the reason of [DEH]."[17] When evaluating SRE petitions, the Act directs the Administrator, "in consultation with the Secretary of Energy," to "consider the findings of the study under [CAA section 211(o)(9)(A)(ii)(I)] and other economic factors."[18] After DOE conducted its 2011 DOE Study and EPA granted two-year extensions to the 14 refineries the study identified, additional refineries petitioned EPA to secure 2011 and 2012 exemptions. EPA shared these new petitions with DOE, which applied the matrix scoring methodology developed in the 2011 DOE Study and shared the scoring results with EPA. EPA chose to satisfy the statutory

---

[12] CAA section 211(o)(9)(A)(ii)(II).
[13] "EPACT 2005 Section 1501 Small Refineries Exemption Study," Office of Policy and Internation Affairs, U.S. Department of Energy, February 2009 ("2009 DOE Study").
[14] Senate Report 111-45, at 109 (2009).
[15] 2011 DOE Study at 31–33.
[16] 77 FR 1320, 1323 (January 9, 2012).
[17] CAA section 211(o)(9)(B)(i).
[18] CAA section 211(o)(9)(B)(ii).

requirements for consultation and consideration of the 2011 DOE Study by using DOE's scoring results in its evaluation of each SRE petition. Consistent with the extensions of exemptions it granted to the 14 small refineries through the 2011 DOE Study, EPA then decided to grant an extension of the exemption to an additional 10 small refineries for 2011, and to nine for 2012. Since 2013, EPA has shared all incoming SRE petitions and supplemental information with DOE.

In some SRE decisions prior to 2016, DOE and EPA concluded that DEH existed only when a small refinery experienced both disproportionate impacts and viability impairment, as measured by the DOE matrix. In response to concerns that this threshold for establishing DEH was too stringent, Consolidated Appropriations Act report language directed DOE to recommend a 50 percent exemption when a small refinery's score on either section of the DOE matrix exceeded the applicable threshold.[19] Subsequent Senate Report language directed EPA to follow DOE's recommendation, and to report to Congress if it did not.[20]

The Congressional direction, along with changing administration policies, prompted EPA to revise its approach to finding DEH at a small refinery. Whereas EPA had previously exercised discretion in evaluating "other economic factors" in its analysis of a small refinery's petition, EPA changed its approach to instead rely on DOE's findings and granted a full exemption whenever DOE findings indicated that EPA consider providing a 50 percent exemption for the small refinery, based on its DOE matrix score.[21] Under this approach, EPA fully exempted a small refinery from its RFS obligations based solely on this DOE finding, which was derived from metrics that assumed some refineries faced higher RFS compliance costs. This approach did not account for EPA's own finding that the costs of RINs used for compliance with the RFS program are the same for all obligated parties and are passed through by all obligated parties to consumers ("RIN cost passthrough").

Subsequent events led EPA to change its approach again, and on December 7, 2021, EPA proposed to deny all then-pending SRE petitions and sought input from stakeholders through a public comment period. On April 7, 2022, and June 3, 2022, EPA issued denials of 105 SRE petitions from 39 refineries spanning the 2016–2021 compliance years on the basis that no small

---

[19] Consolidated Appropriations Act, 2016, Pub. L. No. 114-113 (2015). The Explanatory Statement is available at 161 Cong. Rec. H9693, H10105 (daily ed. Dec. 17, 2015): "If the Secretary finds that either of these two components exists, the Secretary is directed to recommend to the EPA Administrator a 50 percent waiver of RFS requirements for the petitioner."

[20] S. Rep. 114-281, 71 (2016) ("When making decisions about small refinery exemptions under the RFS program, the Agency is directed to follow DOE's recommendations which are to be based on the original 2011 Small Refinery Exemption Study prepared for Congress and the conference report to division D of the Consolidated Appropriations Act of 2016. Should the Administrator disagree with a waiver recommendation from the Secretary of Energy, either to approve or deny, the Agency shall provide a report to the Committee on Appropriations and to the Secretary of Energy that explains the Agency position. Such report shall be provided 10 days prior to issuing a decision on a waiver petition.").

[21] A substantial number of small refineries that showed no viability impairment on the DOE matrix received a finding from DOE that EPA consider a 50 percent exemption, based solely on the small refinery's disproportionate impacts score. See, e.g., "Decision on 2018 Small Refinery Exemption Petitions," Memorandum from Anne Idsal, Acting Assistant Administrator, Office of Air and Radiation to Sarah Dunham, Director, Office of Transportation and Air Quality, August 9, 2019.

refinery demonstrated that they suffer DEH as a result of their RFS compliance costs.[22] EPA presumed that all small refineries could pass on their costs of RFS compliance, and, therefore, no small refinery experienced DEH.[23]

These decisions were challenged in different courts, with two courts issuing decisions on the merits.[24] In *Calumet*, the Fifth Circuit concluded that venue was proper and thus it had the authority to evaluate the challenges to the 20 SRE petitions before it.[25] The court vacated those petition denials.[26] EPA petitioned the Supreme Court for a writ of certiorari, appealing only the court's decision as to venue. The Supreme Court granted the petition for certiorari and reviewed the Fifth Circuit's holding. On June 18, 2025, the Supreme Court held that venue was proper in the D.C. Circuit and vacated and remanded to the Fifth Circuit for disposition consistent with that ruling.[27] On August 7, 2025, the Fifth Circuit transferred the case to the D.C. Circuit due to lack of venue.

In *Sinclair IV,* the D.C. Circuit vacated the 2022 SRE Denial Actions on several bases. First, the court held that EPA improperly focused on RFS compliance costs and not economic hardship.[28] The court also held that EPA did not consider "other economic factors" as required by CAA section 211(o)(9)(B).[29] Finally, the court concluded that the statutory language did not require the RFS program to be the "sole cause" of the small refinery's hardship.[30] The court also held that EPA's denials were arbitrary and capricious because the record evidence did not adequately support EPA's conclusion that the petitioning small refineries fully recovered their RFS compliance costs via the sales price of their fuel.[31] The court did, however, uphold EPA's determinations that certain small refineries were ineligible to petition for an exemption under the text of the statute and EPA's implementing regulations.[32]

In July 2023, EPA denied 26 SRE petitions from 15 refineries spanning the 2016–2018 and 2021–2023 compliance years.[33] The rationale for denying those petitions was largely based on the explanation and analyses in the 2022 SRE Denial Actions. Judicial challenges to the 2023 SRE Denial Action were held in abeyance pending the outcome of the litigation on the 2022 SRE Denial Actions and the Supreme Court's decision in *Calumet*.[34] Once those cases were resolved,

---

[22] "April 2022 Denial of Petitions for RFS Small Refinery Exemptions," EPA-420-R-22-006, April 2022; "June 2022 Denial of Petitions for RFS Small Refinery Exemptions," EPA-HQ-OAR-2021-0556, June 2022 (collectively the "2022 SRE Denial Actions").

[23] 2022 SRE Denial Actions Section IV.D.2.

[24] *Calumet Shreveport Ref., L.L.C. v. EPA*, 86 F.4th 1121, 1133 (5th Cir. 2023); *Sinclair IV*, 114 F.4th at 726-27.

[25] *Calumet*, 86 F.4th at 1133.

[26] *Id*. at 1142.

[27] *EPA v. Calumet Shreveport Ref., L.L.C.,* 145 S. Ct. 1735 (2025).

[28] *Sinclair IV*, 114 F.4th at 707.

[29] *Id*. at 707–08.

[30] *Id*. at 708–09.

[31] *Id*. at 711–14.

[32] *Id*. at 714–21.

[33] "July 2023 Denial of Petitions for RFS Small Refinery Exemptions," EPA-420-R-23-007, July 2023 ("2023 SRE Denial Action").

[34] *See*, *e.g.*, *The San Antonio Refinery v. EPA,* and consolidated cases No. 23-60399, Doc. Nos. 69, 109 (5th Cir.). Other challenges in various other circuits were also held in abeyance.

EPA sought and received remand of many of the petitions addressed in the 2023 SRE Denial Action.[35]

In this document, EPA is issuing decisions on 175 pending SRE petitions from 38 refineries for the 2016–2024 compliance years: 67 petitions (38 percent) stem from the 2022 SRE Denial Actions, and another 26 petitions (15 percent) from the 2023 SRE Denial Action. The remaining 82 petitions (47 percent) were not previously adjudicated.

## III.    EPA Evaluation

This section describes EPA's evaluation of the 175 SRE petitions for compliance years 2016–2024 that EPA is addressing in this document.

### A.    Eligibility

In determining eligibility, CAA section 211(o)(9) provides that only small refineries that received the initial blanket exemption are eligible to petition for an extension of that initial exemption, consistent with a prior EPA interpretation.[36] This does not mean that any refinery that met the definition of "small refinery" at the start of the RFS program is qualified to seek an exemption for later years; the small refinery must have actually received the blanket exemption for the years before 2011 pursuant to the CAA and implementing regulations. This means that the small refinery must have been producing transportation fuel, such that it was an obligated party under the RFS program, to qualify for the initial blanket exemption from the RFS requirements (*i.e.*, a refinery processing fewer than 75,000 bpd of crude oil into only products other than transportation fuel could not receive an exemption from an RFS obligation it did not have). This understanding was affirmed by the D.C. Circuit in *Sinclair IV*, where the court noted that the eligibility requirement was "adopted to align the RFS program with the statutory text and clear implications of the Supreme Court's ruling in *HollyFrontier*."[37]

EPA is also maintaining its approach to size-based eligibility—only a refinery with an average aggregate daily crude oil throughput that does not exceed 75,000 bpd for the year for which the refinery is seeking an exemption and the prior year is eligible to petition for an SRE.[38]

### B.    Ineligibility Determinations

In this document, EPA is determining that four refineries, which collectively submitted seven SRE petitions, are ineligible to petition for an SRE on the grounds that the refineries fail to meet one or more requirements for eligibility and thus EPA is denying these petitions. These

---

[35] *See, e.g., Calumet Montana Refinery, LLC, v. EPA*, and consolidated cases, No. 23-1194, Doc. No. 2091139 (D.C. Circuit) (December 23, 2024). Other petitions seeking review of the 2023 SRE Denial Action were dismissed. *See, e.g., Hunt Refining Company v. U.S. EPA*, No. 23-12347, Doc. No. 56 (11th Cir.) (March 18, 2025), *American Refining Group Inc. v. EPA*, No. 23-2664, Doc. No. 31 (Feb. 28, 2025).

[36] 2022 SRE Denial Actions Section IV.A.

[37] *Sinclair IV*, 114 F.4th at 720; *see also, HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172 (2021) ("*HollyFrontier*").

[38] *See* CAA section 211(o)(1)(K), 40 CFR 80.2 *Small refinery*, 40 CFR 80.1441(e)(2)(iii).

determinations are based on EPA's statutory interpretation, which is being applied to all refineries subject to the RFS program.

For one refinery, EPA determines that the refinery is ineligible to petition for an SRE because the refinery did not receive the initial blanket exemption. The refinery did not qualify as a "small refinery" in 2004 or 2006 because the average aggregate daily crude oil throughput of the refinery exceeded 75,000 bpd during those qualification years.[39] The refinery did not submit the verification letter required by regulation to receive the initial blanket exemption and, because it did not receive that exemption, the refinery is ineligible to petition for an SRE.[40]

For another refinery, EPA determines that the refinery is also ineligible to petition for an SRE because the refinery did not receive the initial blanket exemption. The refinery did not qualify as a "small refinery" in 2004 or 2006 because the refinery did not produce transportation fuel during those qualification years and thus was not an obligated party subject to requirements of the RFS program.[41] The refinery did not submit the verification letter required by regulation to receive the initial blanket exemption and, because it did not receive that exemption, the refinery is ineligible to petition for an SRE.[42]

For the final two refineries, EPA determines that the refineries are ineligible to petition for an SRE for compliance years 2023 and 2024 because the refineries exceeded the 75,000 bpd throughput limit in 2023. Under the RFS regulations, a refinery must meet the definition of a small refinery (*i.e.*, its average aggregate daily crude oil throughput does not exceed 75,000 bpd) in the calendar year for which the refinery is seeking an exemption and the prior year.[43] These two refineries both exceeded the 75,000 bpd threshold in 2023, thereby making the refineries ineligible to petition for an SRE in both 2023 and 2024.[44]

These two refineries each submitted a letter suggesting that EPA's regulations are contrary to the statute or improperly interpreted. We disagree with these assertions.

CAA section 211(o)(9) provides exemptions for small refineries, as defined in CAA section 211(o)(1)(K). The statutory definition of small refinery does not include a specific year and instead speaks to a small refinery's throughput "for a calendar year." EPA, by regulation, has changed the specification years in the definition of small refinery throughout the history of the

---

[39] 40 CFR 80.1141(a)(1), 72 FR 23900 (May 1, 2007); 40 CFR 80.1441(b), 75 FR 14670 (March 26, 2010).
[40] We note that the ineligibility of this refinery to petition for an exemption was previously determined and upheld by the D.C. Circuit in *Sinclair IV*.
[41] 40 CFR 80.1141(a)(1), 72 FR 23900 (May 1, 2007); 40 CFR 80.1441(b), 75 FR 14670 (March 26, 2010).
[42] We note that the ineligibility of this refinery to petition for an exemption was previously determined and upheld by the D.C. Circuit in *Sinclair IV*.
[43] 40 CFR 80.1441(e)(2)(iii); 79 FR 42128, 42152 (July 18, 2014) ("[W]e are modifying the final rule to require that throughput be no greater than 75,000 barrels in the most recent full calendar year prior to an application for hardship. We will also clarify that a qualifying small refinery can't be projected to exceed the threshold in the year or years for which it is seeking an exemption… We believe that these changes reasonably implement the statutory definition of 'small refinery,' which indicates that the 75,000 barrel aggregate daily crude oil throughput is for 'a calendar year,' but does not specify which calendar year should be the focus of inquiry. The final rule places the focus on the time period immediately prior to and during the desired exemption period, which we believe is most appropriate given the objectives of the provision.").
[44] We note that this determination does not extend to the refineries' petitions for other years.

RFS program.[45] Under 40 CFR 80.1441(b), we have also placed certain conditions, which have been upheld by the D.C. Circuit, on small refineries seeking an exemption, including the submission of a verification letter.[46] Therefore, EPA's regulatory condition that in order to be eligible for an SRE, a refinery must not exceed the 75,000 bpd throughput in the year for which it is seeking an exemption and the prior year is consistent with the statute.[47]

The two refineries also posit that EPA is interpreting its regulations improperly, and that the regulations should only apply in circumstances when a refinery petitions for an exemption at a time when the year prior to which they are seeking an exemption is complete (*i.e.*, full-year crude oil throughput data is available), and the year for which they are seeking an exemption is not yet complete (*i.e.*, crude oil throughput data is projected). The refineries suggest that EPA should instead only look at the compliance year for which the exemption is sought in the circumstances where the year for which an exemption is sought has concluded. However, this interpretation would be contrary to EPA's regulations, which, while written to apply in the scenario put forward by the two refineries, nevertheless requires a qualifying small refinery to have a crude oil throughput of less than 75,000 bpd for two consecutive years.[48]

We also note that EPA promulgated the regulations imposing the 75,000 bpd threshold for the year for which a refinery is seeking an exemption and the prior year through rulemaking in 2014,[49] no parties challenged EPA's regulations at that time, and those regulations can no longer be challenged.[50]

## C.    SRE Petition Requirements

The applicable SRE petition requirements are contained in EPA's regulations at 40 CFR 80.1441(e)(2). EPA evaluated the information submitted in each petition—in consultation with DOE as discussed in more detail below—to determine if the petition satisfied the regulatory criteria and met the statutory requirement to demonstrate DEH based on EPA's interpretation of the SRE provisions of the CAA.

## D.    DOE Consultation

EPA consulted with DOE to evaluate SRE petitions from small refineries that have not been determined to be ineligible by EPA. For the decisions issued in this document, EPA shared the SRE petitions and all supporting information with DOE. DOE reviewed the petitions and all

---

[45] *See* 72 FR 23900, 23992 (May 1, 2007); 75 FR 14670, 14866 (March 26, 2010); 79 FR 42128, 42159 (July 18, 2014).

[46] *Sinclair IV*, 114 F.4th at 717–18.

[47] We recognize that the two refineries argue that a hypothetical provided by the Supreme Court in *HollyFrontier* in which a refinery remains eligible to petition for a compliance year subsequent to a year in which the refinery exceeded the 75,000 bpd threshold evidences a statutory requirement that a refinery need only meet the 75,000 bpd limit for the petitioning year. We disagree; the Supreme Court was merely providing an example, and EPA's implementing regulations were not before the Court in that case, which only determined the meaning of the statutory term "extension."

[48] 40 CFR 80.1441(e)(2)(iii).

[49] 79 FR 42128, 42152 (July 18, 2014).

[50] *See* CAA section 307(b)(1), requiring the challenge to EPA rulemaking actions within 60 days of publication in the Federal Register.

the supporting information to inform its evaluation of the petitions utilizing the DOE matrix. DOE then shared the matrix scores for each SRE petition for each compliance with EPA. These matrix scores and any DOE explanation are included in the confidential, refinery-specific appendices to this document.

### E.    Meaning of Disproportionate Economic Hardship

The CAA authorizes EPA to grant an SRE "for the reason of [DEH]." The CAA authorizes EPA to issue exemptions for small refineries based on consideration of the 2011 DOE Study and other economic factors. In this document, and consistent with the D.C. Circuit's opinion in *Sinclair IV*, both factors inform EPA's assessment of whether a small refinery would experience DEH. EPA first looks to the DOE matrix, consistent with the statutory directive in CAA section 211(o)(9)(B)(ii) to "consider the findings of the [2011 DOE Study]." As discussed further below, the DOE matrix is a reasonable proxy for determining whether a small refinery would experience DEH. EPA also considers DOE's findings in determining the exemption amount that EPA should provide.

EPA finds that the DOE matrix—developed in the 2011 DOE Study "to determine whether compliance with the [RFS] would impose a disproportionate economic hardship on small refineries"—properly assesses DEH.[51] Therefore, EPA finds that a small refinery's score on the DOE matrix will generally determine whether the small refinery is experiencing DEH, and to what degree, as described further in Section III.H.

EPA has, in the past, acknowledged DOE's expertise in evaluating economic conditions at refineries and in "develop[ing] a survey form and assessment process to identify when disproportionate economic hardship exists in the context of the renewable fuel standard program."[52] EPA has also "accord[ed] considerable deference to DOE's analysis of disproportionate economic hardship in deciding whether or not to grant a petition for extension."[53] While the Fourth Circuit has concluded that in some circumstances EPA's reliance on the DOE scores was arbitrary and capricious,[54] subsequent DOE scores have provided further explanations in response to that decision. Most recently, the D.C. Circuit in *Sinclair IV* opined that the "2011 DOE study is the component that calls for 'determine[ing] whether compliance with the requirements of [the RFS program] would impose a disproportionate economic hardship on small refineries,'" and that EPA is to consider other economic factors "in addition to considering economic hardship from RFS compliance."[55] These decisions, taken together, indicate that it is appropriate for EPA to defer to DOE's expertise and matrix scoring to assess DEH. It is also appropriate for EPA to continue to utilize the DOE matrix as the primary basis for its assessment of DEH.

EPA also assesses "other economic factors" for a small refinery within the context of the refining industry and the RFS program. The D.C. Circuit concluded that EPA retains "broad

---

[51] CAA section 211(o)(9)(A)(ii)(I) and 2011 DOE Study Section VIII.
[52] *Hermes*, 787 F.3d at 577.
[53] *Id*.
[54] *Ergon West Virginia, Inc. v. US EPA*, 896 F.3d 600 (2018).
[55] *Sinclair IV*, 114 F.4th at 708.

discretion to choose which economic factors it will (and will not) consider."[56] In doing so, EPA independently evaluates all available information in determining whether to grant or deny an SRE petition. If no "other economic factors" compel a different finding on DEH than the DOE score, EPA will utilize the scores on the DOE matrix to determine whether a small refinery would experience DEH. Further discussion of our consideration of other economic factors can be found in the appendices to this document.

Consistent with court decisions, in considering the 2011 DOE Study and other economic factors, EPA does not require compliance with the RFS program to be the sole cause of the small refinery's hardship. However, the hardship does need to have some connection to RFS compliance.[57] The DOE matrix assesses factors related to RFS compliance such as local market acceptance of renewables and percentage of diesel production, as well as renewable fuel blending percentage and RINs net revenue or cost. Other factors unrelated to RFS compliance can also contribute to a small refinery experiencing DEH, and EPA considers those factors as well.

## F. RIN Cost Passthrough

EPA's 2022 and 2023 SRE Denial Actions were premised on an understanding that all obligated parties, including small refineries, benefit from the "RIN cost passthrough" principle. Based on EPA's analysis of the RIN and fuels markets, we determined that obligated parties recover the cost of acquiring RINs (whether those RINs are purchased from other parties or acquired by blending renewable fuel) through higher sales prices for the gasoline and diesel they produce. In this way the cost of acquiring RINs is passed through from obligated parties to consumers of transportation fuel.

While the D.C. Circuit in *Sinclair IV* found small refineries' arguments that they cannot always purchase RINs ratably to be compelling, the court agreed with EPA in its subsequent decision in *Center for Biological Diversity v. EPA* that the principle as applied to the entire transportation fuel market is still valid in.[58] Given the court's decision in *Sinclair IV*, we evaluated SRE petitions by using the DOE matrix and making no presumptions about the extent to which any particular small refinery is able to pass through its RIN costs. To the extent petitioning small refineries presented arguments about RIN cost passthrough, we considered those arguments in our assessment. We note that DOE's assessment of viability impairment in the DOE matrix uses the full cost of RFS compliance with no RIN cost passthrough to assess whether a refinery faces viability impairment. Because this approach presumes no passthrough, it likely overestimates actual RFS compliance costs. Nevertheless, we find that such an approach is appropriate due to our inability to evaluate the degree to which RIN costs are passed through in each and every market into which a small refinery sells transportation fuel.

---

[56] *Hermes*, 787 F.3d at 577.

[57] *Sinclair IV*, 114 F.4th at 708–709 ("For RFS compliance to cause a hardship, the hardship would not have occurred without compliance. But that does not foreclose other factors contributing to the hardship.").

[58] *Ctr. for Biological Diversity v. EPA*, 141 F.4th 153 (D.C. Cir. 2025) ("*CBD*") (recognizing that the "central premise – refineries are able to pass RIN costs along to consumers – *is* generally true").

Fundamental to the 2011 DOE Study and the approach that EPA and DOE used to evaluate SRE petitions prior to calendar year 2017 was the assumption that small refineries that were unable to blend renewable fuel may face a higher cost of compliance given the need to purchase RINs.[59] This potentially places such small refineries at a disadvantage compared to refineries able to acquire RINs by blending renewable fuel. EPA analyzed the cost of purchasing separated RINs relative to the cost of acquiring RINs by blending renewable fuel on multiple occasions, beginning in 2015 with the Burkholder Study,[60] and again in 2016 and 2017 when EPA evaluated the RIN market as part of its consideration of petitions to change the RFS point of obligation.[61] EPA found that, on average, the cost of purchasing separated RINs was equal to the cost of acquiring RINs by blending renewable fuel. Our analysis of pricing data demonstrated that parties that blend renewable fuels discount the price of the fuel they sell to account for the value of the RINs they receive when they purchase renewable fuels. Parties that blend renewable fuel are effectively selling renewable fuel at a lower price than they paid for the renewable fuel. This cost (the difference between the purchase price and the sales price for renewable fuel) is equal to the RIN price. Further, as noted above, EPA's analysis showed that these compliance costs are passed through to consumers in higher prices on the gasoline and diesel subject to the renewable volume obligation (RIN cost passthrough).

EPA reassessed its interpretation of RFS compliance costs and other economic factors unrelated to the RFS program and subsequently denied numerous SRE petitions in the 2022 and 2023 SRE Denial Actions based on its assessment that all small refineries face the same compliance costs in acquiring RINs and recover those costs in the prices they receive for their refined product sales. The D.C. Circuit found that EPA's denials were arbitrary and capricious because of EPA's reliance on RIN cost passthrough principles that the court found had not been demonstrated to be true for each small refinery in each petition year, making EPA's denials contrary to the record evidence.[62]

EPA's previous analysis demonstrates that, at least at the national level and in competitive markets, obligated parties are able to recover their compliance costs through the prices they receive for the gasoline and diesel they sell.[63] EPA acknowledges that some national-scale studies have found less-than-perfect RIN passthrough; however, these deviations are relatively small and therefore would be unlikely to lead to a disproportionate cost of compliance large enough to constitute DEH. EPA also recognizes that its previous assessment of complete RIN cost passthrough was premised on the assumption that small refineries can and should purchase RINs ratably, and that parties that choose to delay RIN purchases may pay higher or lower prices for these RINs than they recover when selling the gasoline and diesel they produce. In *Sinclair IV*, the D.C. Circuit focused on this issue and held that the CAA provides obligated parties flexibility regarding the timing of their RIN purchases and that it was therefore

---

[59] Neither the 2009 DOE Study nor the 2011 DOE Study considered the possibility that refineries would recover the cost of RINs through higher prices for their products.

[60] "A Preliminary Assessment of RIN Market Dynamics, RIN Prices, and Their Effect," Dallas Burkholder, Office of Transportation and Air Quality, US EPA, May 14, 2015.

[61] "Denial of Petitions for Rulemaking to Change the RFS Point of Obligation," EPA-420-R-17-008, November 2017.

[62] *Sinclair IV*, 114 F.4th at 711–15.

[63] 88 FR 44468 (July 12, 2023). This finding was upheld by the D.C. Circuit in *CBD*.

impermissible for EPA to evaluate DEH based on a presumption that small refineries must purchase RINs ratably.[64]

EPA's analysis of the renewable fuel, RIN, and petroleum fuel markets continues to support our previous findings that at the national level and in competitive markets, obligated parties are able to recover their RFS compliance costs (*i.e.*, acquiring RINs) through the prices they receive for the gasoline and diesel they produce. Further, our analysis continues to support our finding that parties that acquire RINs by blending renewable fuels do not acquire these RINs at a lower cost compared to parties that purchase separated RINs, but that these parties instead discount blended fuels sold without a RIN by the value of the RIN. However, consistent with *Sinclair IV*, the SRE decisions we are issuing in this document are not based on the conclusion that all obligated parties, including small refineries, are able to fully recover their RFS compliance costs through RIN cost passthrough.

EPA currently lacks the granular market-level data necessary to precisely evaluate the degree to which a small refinery recovers its RFS compliance costs in each and every market into which it sells transportation fuel. This analysis would require, for example, frequent (*e.g.*, daily) detailed information on the market prices for petroleum blendstocks, renewable fuels, blended fuels, and RINs not only from the small refinery, but also from all other parties selling these products in competition with the small refinery. While pricing information for some of these products is available in many markets, much of this information is not available, particularly for the markets in which small refineries operate. However, the CAA does not require that EPA precisely determine RIN cost passthrough in evaluating SRE petitions. Instead, the CAA states that a small refinery may petition EPA for an extension of the exemption for the reason of DEH.

The CAA also requires EPA to consult with DOE, which evaluates SRE petitions primarily through the various factors identified in the DOE matrix. One of the factors DOE considers is the ability for a small refinery to blend renewable fuel. A small refinery without this ability could experience a competitive disadvantage relative to parties that can blend renewable fuel if that small refinery was also unable to pass through the cost of acquiring RINs to consumers or if parties that blend renewable fuel were able to retain all or a portion of the value of the RIN they obtained by blending renewable fuel.[65] DOE's evaluation of SRE petitions therefore implicitly considers the ability for small refineries to recover the cost of acquiring the RINs they need for RFS compliance. By relying on DOE's findings and, where appropriate, a consideration of RIN cost passthrough principles as part of a consideration of other economic factors, EPA has appropriately considered small refineries' ability to recover the cost of RINs in a manner consistent with *Sinclair IV* and other relevant court decisions.

---

[64] *Sinclair IV*, 114 F.4th at 709–15.

[65] The difference in RIN cost recovery and/or RIN value retained between small refineries and their competitors would also have to be of sufficient magnitude to constitute DEH.

*G.*      *EPA's Response to the Final GAO Report*

Several small refineries suggested in their petitions that the November 2022 GAO Report[66] was evidence that they face higher costs of RFS compliance due to a purported difference in the price they must pay to acquire RINs, and that they therefore will face DEH. While RIN cost passthrough and the price of RIN acquisitions are no longer fundamental to our assessment of DEH, we nonetheless maintain the analysis and conclusions of both EPA and DOE provided comments on a September 2022 draft version of the GAO Report. These comments are available in Appendices IV (EPA) and V (DOE) of the November 2022 GAO Report, EPA's December 2022 RIN Price Analysis,[67] and EPA's May 2, 2023, Response to Final GAO SRE Report.[68]

*H.*      *Authority to Find Partial Disproportionate Economic Hardship*

CAA section 211(o)(9)(B) authorizes EPA to exempt small refineries from their RFS obligations "for the reason of disproportionate economic hardship."[69] The statute does not provide a definition for DEH or its components and, over the life of the RFS program, EPA has developed multiple interpretations of the meaning of DEH. After conducting an analysis of the statutory language, and considering the structure of the SRE and RFS provisions and the congressional objectives for the RFS program, EPA now concludes that the best reading of CAA section 211(o)(9) includes authority for EPA to find that a small refinery would experience DEH if required to comply with its RFS obligations, but that the degree of DEH warrants only a partial exemption from its obligations.[70]

CAA section 211(o)(9)(A)(i) provided that small refineries would be exempt from the requirements of the RFS program until 2011 and included mechanisms for extensions of this initial exemption. First, subparagraph (A)(ii)(I) directed DOE to conduct "a study to determine whether compliance with the [RFS Program] would impose a disproportionate economic hardship on small refineries." For any small refinery that DOE determined would be subject to a "disproportionate economic hardship" if required to comply with its RFS obligations, the statute instructs EPA to extend the exemption for at least two additional years.[71] Second, subparagraph (B) permits a small refinery to petition EPA "at any time" for an "extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship."[72] In evaluating

---

[66] "Renewable Fuel Standard: Actions Needed to Improve Decision-Making in the Small Refinery Exemption Program," November 2022, GAO-23-104273.

[67] "An Analysis of the Price of Renewable Identification Numbers (RINs) and Small Refineries," December 2022, EPA-420-R-22-038.

[68] Available at https://www.epa.gov/renewable-fuel-standard/epa-analysis-price-rins-and-small-refineries.

[69] CAA section 211(o)(9)(B)(i).

[70] We refer to DEH that warrants a partial exemption as "partial DEH" throughout this document. We clarify here that, when we say a small refinery would experience partial DEH, we mean that the small refinery would experience DEH if required to comply with its RFS obligations, but that the degree of DEH warrants only a partial exemption from its RFS obligations.

[71] CAA section 211(o)(9)(A)(ii)(II).

[72] CAA section 211(o)(9)(B)(i).

an SRE petition, subparagraph (B) directs EPA to consider the findings of the DOE study and other economic factors.[73]

CAA section 211(o) does not define "disproportionate economic hardship," nor has EPA supplied a definition by regulation. In the absence of a statutory or regulatory definition, the text of the statute is read in accordance with its ordinary meaning as informed by dictionary definitions.[74] "Disproportionate" means having too much or too little in relation to something else.[75] "Economic" means of, or relating to, or concerned with the production, distribution, and consumption of commodities.[76] "Hardship" means a privation, suffering, or adversity.[77] Both "disproportionate" and "economic" modify "hardship." Thus, in the context of CAA section 211(o)(9), "disproportionate economic hardship" means a financial privation or difficulty that is too large for a small refinery in comparison to the financial difficulty faced by other refineries.[78] However, CAA section 211(o)(9) does not establish *at what point* the economic hardship on the small refinery becomes "too large" in comparison to other refineries, thus making that small refinery eligible for an extension of the exemption.[79] By requiring that extensions of the exemption be "for the reason of disproportionate economic hardship," but leaving that term undefined, Congress left it to the Agency's discretion to "fill up the details" by giving necessary specification to these terms.[80] When a court has determined that Congress has delegated discretion to an agency, its role is to "fix[] the boundaries of the delegated authority, and ensur[e] the agency has engaged in 'reasoned [sic] decisionmaking' within those boundaries."[81]

The comparative analysis is conducted primarily via the application of the DOE matrix.[82] As DOE explained in the 2011 DOE Study, "[s]mall refineries can suffer disproportionate economic hardship from compliance with the RFS program if blending renewable fuel into their transportation fuel or purchasing RINs increases their cost of products relative to competitors."[83]

---

[73] *Id* at (ii).

[74] *See, e.g.*, *PG&E v. FERC*, 113 F.4th 943, 947-58 (D.C. Cir. 2024) ("Courts must interpret statutes, no matter the context, based on the traditional tools of statutory construction.... Therefore, when addressing a question of statutory interpretation, we begin with the text. And when construing the text, we look to the ordinary meaning of its terms.") (internal citations omitted); *Yates v. United States*, 574 U.S. 528, 537 (2015) ("Ordinarily, a word's usage accords with its dictionary definition.").

[75] *Disproportionate*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[76] *Economic*, Webster's Third New International Dictionary (1993).

[77] *Sinclair IV*, 114 F.4th at 707 (quoting Black's Law Dictionary (11th ed. 2019)); *see also Sinclair Wyo. Ref. Co. v. EPA*, 874 F.3d 1159, 1170 (10th Cir. 2017) (*"Sinclair I"*) ("[A] 'hardship' is something that 'makes one's life hard or difficult…'").

[78] *Sinclair I*, 874 F.3d at 1170 ("The statute also commands the EPA to consider the disproportionate impact of the RFS Program, which inherently requires a comparative evaluation.").

[79] *Hermes*, 787 F.3d at 575; *see Sinclair IV*, 114 F.4th at 707.

[80] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95 (2024) ("For example, some statutes 'expressly delegate[]' to an agency the authority to give meaning to a particular statutory term. *Batterton v. Francis*, 432 U. S. 416, 425, 97 S. Ct. 2399, 53 L. Ed. 2d 448 (1977) (emphasis deleted). Others empower an agency to prescribe rules to "fill up the details" of a statutory scheme, *Wayman v. Southard*, 23 U.S. 1, 10 Wheat. 1, 43, 6 L. Ed. 253 (1825)"); *See Wayman*, 23 U.S. at 42-43 (distinguishing between "powers which are strictly and exclusively legislative…which must be entirely regulated by the legislature itself, [and] those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details.").

[81] *Loper*, 603 U.S. at 371 (citing *Michigan v. EPA*, 576 U. S. 743 (2015)).

[82] EPA also considers other economic factors that may impact its decision to extend the exemption.

[83] 2011 DOE Study at vii.

The study developed metrics to evaluate whether small refineries would suffer an economic hardship relative to an industry standard.[84] These metrics include the small refinery's access to capital/credit that may be needed to develop blending capabilities or purchase RINs, the percentage of diesel production at the refinery compared to the industry average, the refinery's three-year average refining margin versus the three-year industry average refining margin, the local market's acceptance of renewable fuels, and whether the refinery operates in a niche market that produces higher-than-average refining margins, among others.[85] Each metric is assigned a score that is then used to produce two overall scores, one for disproportionate impacts and one for viability impairment.

In the early years of the program, DOE and EPA determined that a small refinery would experience DEH—and would thus be eligible for an extension of the exemption—if it scored above a set threshold on both the disproportionate impacts and viability impairment sections of the DOE matrix. In an explanatory statement accompanying the 2016 Appropriations Act, members of Congress directed the Secretary of Energy to recommend to the EPA Administrator a 50 percent exemption of a petitioning small refinery's RFS obligations if the small refinery scored above the relevant threshold on either section of the DOE matrix.[86] In response to this directive, the Secretary of Energy began providing EPA with findings that EPA consider providing 50 percent exemptions for small refineries that scored above the threshold on one section of the DOE matrix but not both. In June 2016, the Senate Appropriations Committee, expressing concern over the denial of SRE petitions where the Agency determined that certain refineries would experience a DEH as a result of compliance with their RFS obligations but would still remain profitable, published a committee report that directed EPA to follow DOE's recommendations and to report to the committee if it did not.[87] Members of Congress renewed

---

[84] *Id.*

[85] *Id.* at 34–35.

[86] Consolidated Appropriations Act, 2016, Pub. L. No. 114-113 (2015). The Explanatory Statement is available at 161 Cong. Rec. H9693, H10105 (daily ed. Dec. 17, 2015) (hereinafter "Explanatory Statement"). ("According to the [2011 DOE Study], disproportionate economic hardship must encompass two broad components: a high cost of compliance relative to the industry average disproportionate impacts and an effect sufficient to cause a significant impairment of the refinery operations viability. If the Secretary finds that either of these two components exists, the Secretary is directed to recommend to the EPA Administrator a 50 percent waiver of RFS requirements for the petitioner. The Secretary is reminded that the RFS program may impose a disproportionate economic hardship on a small refinery even if the refinery makes enough profit to cover the cost of complying with the program. Small refinery profitability does not justify a disproportionate regulatory burden where *Congress has explicitly given EPA authority, in consultation with the Secretary, to reduce or eliminate this burden.*") (emphasis added).

[87] Department of the Interior, Environment, and Related Agencies Appropriations Bill, 2017, Senate Report 114-281, 65 (June 16, 2016) (hereinafter "Senate Report") ("In response to several recent petitions, the Agency determined that compliance with the RFS would have a disproportionate economic impact on a small refinery, but denied hardship relief because the small refinery remained profitable notwithstanding the disproportionate economic impact. This is inconsistent with congressional intent because the statute does not contemplate that a small refinery would only be able to obtain an exemption by showing that the RFS program threatens its viability. Congress explicitly authorized the Agency to grant small refinery hardship relief to ensure that small refineries remain both competitive and profitable… When making decisions about small refinery exemptions under the RFS program, the Agency is directed to follow DOE's recommendations … and the [Explanatory Statement].")

these directives in subsequent reports.[88] EPA's new interpretation of CAA section 211(o)(9) is consistent with these directives.

These directives to DOE and EPA prompted the Agency to reevaluate its approach to SRE petitions. Initially, the Agency concluded that the better reading of CAA section 211(o)(9)(B) called for either fully granting or fully denying SRE petitions, precluding partial exemptions.[89] However, EPA announced that it was reconsidering its position on partial hardship and partial exemptions in the 2020 RFS Rule.[90] Acknowledging that it had previously concluded that CAA section 211(o)(9)(B) did not permit a finding of partial hardship, the Agency determined that the statute was silent on the issue and provided EPA discretion in determining the scope of the exemption.[91] EPA stated that its policy moving forward would be to follow DOE's recommendations, including granting partial (50 percent) exemptions where appropriate.[92]

A reading of CAA section 211(o)(9)(B) that includes authority for EPA to find partial DEH is more consistent with the structure of the SRE and RFS provisions and congressional objectives for the program than a reading that EPA lacks such authority. In 2005 and 2007, Congress amended the CAA to establish the RFS program to "increase the production of clean renewable fuels," among other purposes.[93] The program was designed to provide obligated parties with flexibility and included multiple means for them to comply with the program.[94] Congress was particularly concerned with the impacts of the RFS program on small refineries. In addition to the other compliance flexibilities available to all obligated parties, it provided other means of addressing hardship that may arise in connection with a small refinery's RFS obligations. Congress fully exempted small refineries from the RFS program until 2011 while also directing DOE to study whether compliance with the program would impose a "disproportionate economic hardship" on small refineries. If so, EPA was required to extend the

---

[88] H. R. Rep. No. 114-91, at 112 (2015); S. Rep. No. 114-54, at 95 (2015); H. R. Rep. No. 114-632, at 63-64 (2016) ("Where the refiner or refinery shows a disproportionate economic hardship based on site specific factors and where the Secretary of Energy recommends to EPA that a waiver, in partial or full, is warranted, the Committee finds the Administrator has the necessary authority to grant a partial waiver."); S. Rep. No. 114-281, at 70-71 (2016); H. R. Rep. No. 115-230, at 99-100 (2017); S. Rep. No. 115-132, at 93-94 (2017); S. Rep. No. 115-258, at 101 (2018); S. Rep. No. 115-276, at 70 (2018). Subsequent report language does not speak to this topic.

[89] "Decision on 2018 Small Refinery Exemption Petitions," Memorandum from Anne Idsal, Acting Assistant Administrator, Office of Air and Radiation to Sarah Dunham, Director, Office of Transportation and Air Quality, August 9, 2019.

[90] 85 FR 7016 (February 6, 2020) ("2020 RFS Rule").

[91] Id. at 7052 (Noting that section 211(o)(9) is "silent with respect to EPA's authority to issue partial exemptions. Nothing in the statute directly addresses this issue. No statutory language exists characterizing the scope of an exemption; there are no terms employed such as 'partial' or 'full,' or '50%' or '100%.' Moreover, nothing in the statute obligates EPA to provide full relief where we find that only partial relief is warranted.")

[92] Id. at 7019. Subsequent EPA actions under the RFS program did not address the question of partial hardship in EPA's projection of SREs in its annual rulemakings, or in its SRE decisions.

[93] See Energy Policy Act of 2005 (EPAct), Pub. L. No. 109-58, 119 Stat. 594; Energy Independence and Security Act of 2007 (EISA), Pub. L. No. 110-140, 121 Stat. 1492.

[94] CAA section 211(o)(5)(A)–(C) (requiring EPA to establish a credit trading program allowing obligated parties that acquire excess credits in one year to apply credits toward compliance in a subsequent year or to sell the credits to another obligated party for use in its own compliance); CAA section 211(o)(5)(D) (permitting an obligated party to carry forward a credit deficit into the following compliance year).

exemption for at least two additional years.[95] Congress also provided a mechanism for limited, future exemptions for small refineries for the reason of DEH.[96] In doing so, Congress crafted a legislative balance that promoted greater use of renewable fuel while also considering the impacts of the RFS program on small refineries.[97] EPA's authority under CAA section 211(o)(9)(B) to find a partial hardship is a natural incident to this balance.[98]

The statutory structure of CAA section 211(o)(9)(B) supports the interpretation that EPA has authority to find partial DEH. In crafting CAA section 211(o)(9), Congress created a series of exemptions for small refineries that increase in stringency, reflecting Congress's intent that exemptions would become more targeted over time. The initial exemption under subparagraph (A)(i) had the greatest scope in breadth and duration. It applied to all refineries that met the statutory definition of a small refinery and followed EPA's implementing regulations, and applied for a period of five years, beginning in 2006 and expiring in 2011. The initial exemption did not impose any other conditions or limitations.

In subparagraph (A)(ii), Congress imposed greater restrictions when compared to the initial exemption. First, Congress decreased the pool of eligible small refineries by adding additional eligibility criteria. Rather than applying to any small refinery that meets the statutory definition, Congress limited the subparagraph (A)(ii) exemption by conditioning an extension of the exemption on a DOE finding that the small refinery would experience DEH if required to comply with its RFS obligations.[99] Second, Congress decreased the duration of the subparagraph (A)(ii) exemption, moving from five years to a minimum of two.[100] These changes to the structure of the exemption reflect Congress's intent that the exemptions become more targeted, applying to those small refineries that need it most, those that would experience DEH as a result of complying with their RFS obligations.

This intention is further confirmed by the text of the subparagraph (B) exemption, which is even more circumscribed than subparagraph (A)(ii). Most notably, unlike the initial exemption and subparagraph (A)(ii) extension, Congress in subparagraph (B) for the first time required action on the part of the small refinery to receive an exemption. The small refinery must petition EPA for an extension of the exemption. Further, Congress again shrank the breadth of the exemption in subparagraph (B), dropping it down to a single refinery. It also further limited the

---

[95] CAA section 211(o)(9)(A)(ii)(II).

[96] CAA Section 211(o)(9)(B).

[97] *Sinclair IV*, 114 F.4th at 711 ("The RFS program reflects a carefully crafted legislative bargain to promote renewable fuels, but also to provide an exemption mechanism for small refineries.")

[98] Additionally, EPA's authority to either fully enforce or, under CAA section 211(o)(9)(B), to fully exempt a refinery of its RFS obligations necessarily includes the authority to partially exempt the refinery of those obligations. *Cf. Soaring Eagle Casino & Resort v. NLRB*, 791 F.3d 648, 659 (6th Cir. 2015) (holding that the tribal power to exclude nonmembers from tribal lands "necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct"); *see also Bremer v. Johnson*, 834 F.3d 925, 931 (8th Cir. 2016) (finding that a grant of "sole discretion … necessarily includes authority to implement practices or procedures for making decisions"). EPA does not understand CAA section 211(o)(9) to exclusively authorize EPA to either completely obligate or completely exempt a small refinery while prohibiting the exercise of those authorities at intermediate degrees. Such a reading would undermine the regulatory balance Congress has charged EPA with continually refining.

[99] CAA section 211(o)(9)(A)(ii)(II).

[100] *Id.*

duration of the exemption, down to a single year.[101] Finally, Congress included additional criteria for extending an exemption. In evaluating a petition under subparagraph (B), EPA must consider not only the findings of the 2011 DOE Study, but also other economic factors. These additional limitations evince Congress's intention that exemptions for small refineries would become more targeted with time and reading CAA section 211(o)(9)(B) as including authority to find partial hardship and partially exempt small refineries aligns with this intention.

A reading of CAA section 211(o)(9) that includes authority for EPA to find partial DEH is further supported by the congressional goals of the RFS program. One of the purposes of the RFS program is to "increase the production of clean renewable fuels," but in crafting the RFS program, Congress was concerned that the program may impose special burdens on small refineries and provided unique mechanisms to relieve small refineries of their RFS obligations if such obligations rose to the level of DEH.[102] These concerns may arise even when a small refinery would experience a lesser degree of DEH when compared to other small refineries. Consider the small refinery that scores above the threshold on one section of the DOE matrix but not the other. Under an all-or-nothing reading of the CAA section 211(o)(9)(B) exemption, unless there are other economic factors weighing in favor of extending the exemption, EPA may decline to extend the exemption to a small refinery that scored above the threshold on one section of the DOE matrix but not the other. This would leave the small refinery worse off, as it would need to comply with all its RFS obligations despite evidence that such obligations impose a greater degree of economic hardship on the small refinery when compared to other refineries, as demonstrated by its score above the threshold on one section of the DOE matrix. Such a denial would potentially implicate Congress's concerns regarding the impact of the RFS program on small refineries.

However, the alternative of fully extending the exemption to a small refinery that only scores above the threshold on one section of the DOE matrix is no better. Were EPA to fully extend the exemption, the small refinery would not be required to retire any RINs for RFS compliance despite evidence that the small refinery can shoulder a portion of its RFS obligations without disproportionate adverse consequence. Fully exempting a small refinery that only scores above the threshold on one section of the DOE matrix goes further than necessary to address the DEH faced by the small refinery, thereby undercutting congressional goals for the RFS program.

Further, by fully extending the exemption when the small refinery only demonstrates partial DEH, the small refinery receives a competitive advantage over other small refineries that

---

[101] While CAA section 211(o)(9)(B) does not contain an explicit limit on the duration of the exemption extension, it does clearly indicate that each SRE petition and EPA's evaluation thereof are individual acts. The statute permits "*A small refinery*" to petition for "*an extension of the exemption*" and provides guidance to EPA when "evaluating *a* petition." (emphasis added). Considering that the statute creates new RFS obligations for a refinery on an annual basis, both EPA and the courts have consistently interpreted section 211(*o*)(9)(B) as providing for exemptions for specific compliance years. *See Sinclair I*, 874 F.3d at 1170 ("[CAA 211(*o*)(9)(B)] prescribes the overall process… whether a refinery will suffer 'disproportionate economic hardship' if it is required to participate in the RFS Program *for a given year*…") (emphasis added). Further, the absence of a specific duration in section 211(o)(9)(B) when compared to section 211(o)(9)(A)(i) and section 211(o)(9)(A)(ii)(I) suggests that Congress meant for this exemption to apply to a single compliance year, otherwise it would have provided a longer timeframe as it did in the other sections. EPA has in the past exempted small refineries for multiple compliance years, but finds that in general, the statute contemplates exemptions for a single compliance year.
[102] EPAct, Pub. L. No. 109-58, 119 Stat. 594; *HollyFrontier*, 141 S. Ct at 2175.

demonstrated a greater degree of hardship and received a full exemption. The former refinery is better positioned to bear the costs of RFS compliance than the latter, yet both small refineries receive the exact same outcome—complete discharge from their RFS obligations. This places the small refinery experiencing partial DEH in a superior economic position than its counterpart. Considering how careful Congress was in striking a balance between the economic concerns of the refining industry and fostering renewable fuel demand, it cannot be the case that Congress would have permitted a small refinery to game the system by incurring a benefit above and beyond what is necessary to address the DEH faced by the small refinery.

Because neither fully denying nor fully granting an SRE petition in these edge cases effectuates the purposes of the RFS program, EPA, exercising the discretion afforded by Congress, finds that the middle path strikes the appropriate balance. By reading CAA section 211(o)(9) as permitting EPA to find partial DEH, the Agency can issue an exemption commensurate with the degree of DEH experienced by small refineries in these situations. In doing so, the Agency continues to bolster the demand for renewable fuels while also ensuring that small refineries that experience DEH resulting from compliance with their RFS obligations receive an appropriate exemption.

The decisions issued in this document are not retroactive because EPA is applying its revised approach to currently-pending SRE petitions (both newly remanded and previously undecided), which does not take away or impair "vested rights acquired under existing laws" or create a "new obligation…in respect to transactions…already past."[103] Rather, it confirms the status quo that petitioning small refineries comply with *preexisting* RFS obligations; therefore, no rights had vested in any of the small refineries' uncompleted transactions (*e.g.*, their pending petitions). These RFS obligations were previously imposed by Congress and implemented through EPA regulations wholly separate from the SRE petition process. Moreover, Congress delegated resolution of SRE petitions to EPA "at any time,"[104] thereby expressly authorizing any purported retroactive effect, and EPA reasonably adjudicated the SRE petitions by applying the proper statutory interpretation to the facts at hand, making any purported retroactive effect permissible.[105] Additionally, EPA has repeatedly stated that small refineries should expect to comply with their RFS obligations unless and until an exemption is received.[106] As such, the decisions issued in this document do not disrupt any reasonable expectations small refineries could have regarding prior approaches. Moreover, any reliance petitioners could have plausibly assumed regarding EPA's prior approach would be that EPA would return to its prior use of the 2011 DOE Study, when EPA granted a full exemption when DOE made a finding of 100 percent exemption. But EPA's approach is to now grant both full and partial exemptions, as the DOE matrix may suggest either full or partial exemptions for small refineries. Because EPA is implementing a more expansive approach, there is no harm to small refineries for EPA to now apply this new approach without providing notice.

---

[103] *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994); 42 U.S.C. § 7545(*o*)(3)(B)(ii)(I); 40 CFR 80.1406.
[104] CAA section 211(o)(9)(B)(i), (ii).
[105] *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 159 (D.C. Cir. 2010).
[106] *See, e.g.*, "Financial and Other Information to Be Submitted with 2016 RFS Small Refinery Hardship Exemption Requests," December 6, 2016, pg. 3 ("[p]etitioning small refineries should *always presume* that they are subject to the requirements of the RFS program and include RFS compliance in their overall planning.") (emphasis added), available at https://www.epa.gov/sites/default/files/2016-12/documents/rfs-small-refinery-2016-12-06.pdf.

# IV. Implementation

This section describes how EPA will implement the decisions issued in this document. EPA will extend the exemption for those small refineries receiving a full or partial exemption in the manner described below with respect to either all or half the corresponding RFS obligations for the relevant compliance years. Small refineries whose SRE petitions were decided in this document may be required to take additional actions related to compliance as well.

## A. RIN Return

Many small refineries granted full or partial exemptions by the decisions issued in this document have already fulfilled their compliance obligations for past compliance years. To implement the exemptions extended to those small refineries for those years, EPA will return the corresponding RINs retired by those small refineries for each compliance year. For example, a small refinery whose 2023 SRE petition is fully granted will have all the RINs it retired to demonstrate compliance with its 2023 RFS obligations returned. A small refinery whose 2019 SRE petition is partially granted will have half the RINs it retired to demonstrate compliance with its 2019 RFS obligations returned. As further explained below, EPA has determined that returning RINs in this manner is the most equitable and least market-disruptive way to implement exemptions when exempted parties initially complied with their putative RFS obligations. While in the past EPA has declined to return expired RINs already retired for compliance, EPA plans to return the expired RINs to small refineries whose SRE petitions were granted in this document to provide small refineries the opportunity to utilize the RINs.

EPA acknowledges that the value of the RINs returned to exempted small refineries will depend to a significant degree on whether they are "expired" or "unexpired." Pre-2023 vintage RINs returned to small refineries will be "expired," meaning they cannot be used to meet future RFS compliance obligations.[107] In the abstract, these RINs retain residual value to the extent they can be used to satisfy outstanding, non-exempted pre-2023 obligations by the small refinery. We expect very few small refineries, if any, will have a compliance use for these pre-2023 vintage RINs. However, 2023 RINs returned to small refineries will be available for trading or compliance with open 2024 RFS obligations.[108]

## B. Legal Authority

This method of implementing exemptions for parties who have already complied with their RFS obligations is consistent with EPA's past practice, CAA section 211(o), EPA's RFS regulations, and the Ninth Circuit's unpublished decision in *Kern Oil & Ref. Co v. US EPA*.[109] The consequence of an SRE, when timely granted, is relief from the obligation to retire a quantity of RINs derived from the applicable volume requirements.[110] When a party that has already retired RINs for a compliance year later petitions for and receives a corresponding

---

[107] CAA section 211(o)(5)(C), (D); 40 CFR 80.1428(c).
[108] The 2024 RFS compliance deadline is December 1, 2025.
[109] *Kern Oil & Ref. Co v. US EPA*, No. 21-71246 (9th Cir. August 16, 2022) ("*Kern Oil*").
[110] CAA section 211(o)(9)(A), (o)(2)(A); 40 CFR 80.1441.

exemption, EPA has determined these exemptions are typically best implemented by reversing the retirement transaction—that is, by returning those RINs to the party who retired them.

The structure of the RFS statutory provisions also indicates the RIN-return implementation method is consistent with congressional intent: The CAA permits small refineries to petition for an extension of the exemption "at any time," while also providing for the expiration of RINs after a specified period of time.[111] The CAA also requires in every instance that RINs be associated with the refining, blending, or importation of renewable fuel.[112] To properly give meaning to the various statutory provisions, the RFS statute allows small refineries the flexibility to seek and receive exemptions "at any time," including before or even long after the compliance deadline has passed and RINs of that compliance year vintage have expired. The implementation of the exemption must also be consistent with the CAA, and thus the compliance credits, or RINs, must correspond to real-world fuel volumes. This balancing of competing interests is present throughout the RFS program.[113]

In *Kern Oil*, the Ninth Circuit noted that the CAA does not instruct EPA how to implement exemptions granted after a small refinery has already complied with its RFS obligations for a given compliance year. The court endorsed EPA's "default" method for implementing such exemptions, explaining that EPA's reasoning was "persuasive" and thus entitled to "respect."[114] EPA is providing in this document a broader remedy than that approved by the Ninth Circuit in *Kern Oil*. There, EPA had only refunded *unexpired* RINs to a small refinery that had initially complied with its RFS obligations. Here, EPA plans to refund *all* retired RINs—expired and unexpired—to exempted small refineries. Thus, in the absence of any statutory instruction to the contrary, EPA believes the CAA contemplates the same result for small refineries whether they receive exemptions before or after the relevant compliance deadline. Given the statutory language, this approach is the only one supported by the statute.

EPA acknowledges that it has in exceptional circumstances permitted individual small refineries to generate new, current-year vintage RINs as a method of implementing exemptions when decisions denying those exemptions were vacated by a court.[115] To the extent the present action departs from that approach, EPA acknowledges that it is taking a different approach to implement the exemptions here by uniformly returning the RINs retired for the exempted compliance year. This choice is justified in large part by the sheer volume of exemptions EPA is implementing in this document. EPA has chosen to uniformly apply its customary approach in this document in the interests of administrative economy, equity, and limiting large-scale disruptions to the RIN market that would occur if a corresponding number of new RINs were generated and placed in circulation. We estimate that were EPA to allow small refineries to generate new, current-year vintage RINs to replace the old, expired RINs used to satisfy their

---

[111] CAA section 211(o)(9)(B)(i); (o)(5)C).

[112] CAA section 211(o)(5)(A)(i).

[113] *Sinclair IV*, 114 F.4th at 711. ("The RFS program reflects a carefully crafted legislative bargain to promote renewable fuels, but also to provide an exemption mechanism for small refineries. EPA . . . cannot rewrite the balance established by Congress.")

[114] *Kern Oil* at *2 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

[115] *See, e.g.*, *Producers of Renewables United for Integrity Truth & Transparency v. EPA*, No. 19-9532, Doc. No. 10110648841 (10th Cir. Feb. 23, 2022) (challenging RIN replacement remedies applied in five exemption decisions).

prior RFS obligations, approximately 3 billion new RINs would be introduced into the market. This sudden and significant influx of RINs would result in decreased RIN prices, and in turn decreased future investments in renewable fuel production. It is EPA's judgment that the benefits of maintaining a stable RIN market and the connection between RIN generation and real-world fuel volumes outweigh the refinery-specific benefits of generating new RINs. Further, EPA's RIN-return method has been reviewed by an appellate panel and deemed lawful.[116] Thus, EPA has determined its implementation of the exemptions granted in this document is a reasonable and prudent exercise of its authority under the Clean Air Act.

## C.    *Reporting Requirements*

As a result of the decisions issued in this document, nearly all affected small refineries will need to submit revised compliance reports for one or more years reflecting the change in their RFS obligations for that year. Such small refineries must submit revised compliance reports by October 1, 2025, and will need to use a modified version of the RVO annual compliance report form (RFS0304 form) that enables each entity to report exempted volumes of gasoline and diesel fuel separate from any obligated volumes.

- Small refineries receiving a full exemption will need to submit a revised compliance report reflecting zero gallons of obligated gasoline and diesel and zero renewable volume obligations (RVOs) for that compliance year under the RVO categories, but must still report their total annual production volumes of gasoline and diesel as exempted fuel using the new exempted category.
- Small refineries receiving a partial exemption will need to submit a revised compliance report reflecting 50 percent of their total annual production volumes of gasoline and diesel as obligated fuel and 50 percent of their RVOs for that compliance year under the RVO categories, but must still report the other 50 percent of their total annual production volumes of gasoline and diesel as exempted fuel using the new exempted category. Such small refineries will need to retire (or have already retired) sufficient RINs to fully satisfy their 50 percent obligation or carry forward the outstanding obligation to the subsequent compliance year as a RIN deficit if permitted under 40 CFR 80.1427(b).
- Small refineries receiving a denial may need to submit a revised compliance report if they did not otherwise comply with their RFS obligations for that compliance year. Such small refineries will need to retire (or have already retired) sufficient RINs to fully satisfy their full obligation or carry forward the outstanding obligation to the subsequent compliance year as a RIN deficit if permitted under 40 CFR 80.1427(b).

We are aware that some small refineries initially carried forward a RIN deficit from 2023 into 2024, received a denial or partial grant of their 2023 SRE petition, and thus may want to now retire additional RINs toward that 2023 obligation. Because the 2024 compliance deadline has not yet passed and 2023 RINs remain valid for use towards 2023 or 2024 RVOs, we are allowing such small refineries to retire additional 2023 RINs towards their 2023 RVOs. Such

---

[116] *Sinclair Wyoming Refining Co., LLC v. US EPA*, 72 F.5th 1137 (10th Cir. 2023) ("*Sinclair III*").

RIN retirements must be completed and revised compliance reports must be submitted by October 1, 2025.

In addition, we note that a small refinery receiving either a full or partial exemption for a given compliance year is not exempt from having to comply with any RIN deficits that were carried forward from the previous compliance year. Such small refineries must still retire (or have already retired) sufficient RINs to fully satisfy their RIN deficits carried forward from the previous compliance year.

## V.    Final Action on Petitions

Section 211(o)(9)(B) of the CAA gives EPA the authority to issue an SRE when a small refinery demonstrates DEH. Based on EPA's statutory interpretations, consideration of the DOE matrix and consultation with DOE, and confirmatory evaluation of other economic factors, EPA finds that of the 175 pending SRE petitions for the 2016–2024 compliance years, 63 have demonstrated DEH, 77 have demonstrated partial DEH that warrant partial exemptions, and 28 have not demonstrated DEH. We also find that seven of the pending SRE petitions for the 2021–2024 compliance years are from refineries that are ineligible to petition for an SRE.

This document and the final actions discussed within it are not rulemakings and are not subject to the various statutory and other provisions applicable to a rulemaking. These actions are immediately effective upon issuance.

## VI.    Judicial Review

Section 307(b)(1) of the CAA governs judicial review of final actions by EPA. This section generally provides that petitions for judicial review of final actions that are nationally applicable must be filed in the United States Court of Appeals for the District of Columbia Circuit, and petitions for judicial review of actions that are locally or regionally applicable must be filed in the appropriate regional circuit.[117] However, petitions for judicial review of a final action that is locally or regionally applicable must be filed in the D.C. Circuit when "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination."[118]

As the Supreme Court recently articulated in *Calumet*, the first step in determining the appropriate venue for judicial review of an EPA final action is to ascertain whether the action at issue is nationally applicable or locally or regionally applicable.[119] If the action is nationally applicable, judicial review belongs in the D.C. Circuit. If the action is locally or regionally applicable, then the second step is to determine whether EPA has appropriately invoked the "nationwide scope or effect" exception to "override the default rule" that judicial review of a locally or regionally applicable action belongs in the appropriate regional circuit.[120] The exception applies, and judicial review of EPA's action belongs in the D.C. Circuit, if EPA

---

[117] CAA section 307(b)(1).
[118] *Id.*
[119] *Calumet*, 145 S. Ct. at 1746.
[120] *Id.* at 1746.

invokes the exception for a final action that is "based on a determination of nationwide scope or effect" and accompanied by an EPA finding of this basis.[121] A determination is "the justification [EPA] gives for it[s] action, which can be found in its explanation of its action."[122] A determination has a nationwide scope when it applies throughout the country as a legal matter, and it has a nationwide effect when it applies throughout the country as a practical matter.[123] Finally, an action is "based on" a determination of nationwide scope or effect when the determination "lie[s] at the core of the agency action," so as to form the most important part of the agency's reasoning.[124] Put another way, an EPA action is based on a determination of nationwide scope or effect "only if a justification of nationwide breadth is the primary explanation for and driver of EPA's action."[125]

In this document, EPA is adjudicating SRE petitions pursuant to the authority granted to the Agency by CAA section 211(o)(9)(B). Each adjudication is a separate "action" for the purposes of determining venue under CAA section 307(b)(1), and because each adjudication only applies to a single refinery, each action is locally or regionally applicable.[126] However, EPA's adjudication of the relevant petitions is based on several determinations of nationwide scope or effect that formed the core basis for the Agency's decision.

First, these adjudications are based on EPA's determination that CAA section 211(o)(9) provides EPA with the authority to find that a small refinery would experience partial DEH if required to comply with its RFS obligations and to extend a partial exemption. As detailed in Section III.H, CAA section 211(o)(9)(B) grants EPA authority to temporarily extend the exemption from RFS obligations to a small refinery that demonstrates "disproportionate economic hardship," but the statute does not define that phrase or its components, suggesting Congress left it to the Agency's discretion to "fill up the details" when determining how to implement this provision.[127] EPA interprets CAA section 211(o)(9)(B), based on the plain language, structure, and objective of the statute, to provide the Agency with the authority to find that a small refinery would experience partial DEH and to extend a partial exemption. This determination has nationwide scope because it is an interpretation of a federal statute and CAA section 211(o)(9)(B)(i) by its terms applies nationwide.[128] Additionally, this determination has nationwide effect because it applies generically to all refineries nationwide, regardless of their geographic location.[129]

Second, these adjudications are based on EPA's determination that the DOE matrix is a reasonable proxy for DEH, and EPA will defer to DOE's findings unless EPA's consideration of other economic factors compels a different result. As detailed in Section III.E, CAA section 211(o)(9)(B) permits a small refinery to petition for an extension of the exemption from its RFS obligations for the reason of DEH. The statute directs EPA to "consider the findings of the [2011

---

[121] *Id*. at 1749-50.
[122] *Id.* at 1750 (internal quotations omitted).
[123] *Id.*
[124] *Id.* at 1751.
[125] *Id.*
[126] *Id*. at 1748.
[127] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95.
[128] *Calumet*, 145 S. Ct. at 1752.
[129] *Id.*

DOE study] and other economic factors" in evaluating a petition but provides no further instruction as to how to effectuate these obligations.[130] As the author of the study and through its work assessing SRE petitions in conjunction with EPA, DOE has developed extensive expertise in evaluating economic conditions at U.S. refineries that is fundamental to the process both DOE and EPA use to identify whether DEH exists for each petitioner. With limited exceptions, EPA has consistently relied upon DOE's expertise in the Agency's adjudication of SRE petitions over the life of the RFS program. Thus, EPA has determined that the best way to fulfill its obligation to "consider the findings of the [2011 DOE study]" under CAA section 211(o)(9)(B) is to defer to DOE's application of its matrix and resulting findings in evaluating whether a small refinery would experience DEH. EPA has further determined that the best way to fulfill its obligation to consider "other economic factors" is to independently assess all available information and weigh whether this information compels EPA to depart from DOE's findings. This determination has nationwide scope because it is both an interpretation of a federal statute and CAA section 211(o)(9)(B)(i) by its terms applies nationwide, and it is a rebuttable presumption that DOE's finding as to whether a given small refinery would experience DEH, based on application of the DOE matrix, is correct, unless EPA's consideration of other economic factors compels it to depart from DOE's findings. Additionally, this determination has nationwide effect because it applies generically to all refineries nationwide, regardless of their geographic location.

Third, these adjudications are based on EPA's determination that, when extending the exemption, either wholly or partially, to a small refinery that has already retired RINs to comply with its RFS obligations, CAA section 211(o) restricts EPA to returning some or all of those retired RINs, commensurate with the degree of the exemption. As detailed in Section IV.B, returning RINs in this manner effectuates the best reading of the statute. CAA section 211(o)(5) requires that every instance of RIN generation be associated with the refining, blending, or importation of renewable fuel. Section 211(o)(5) also requires that RINs expire after a certain amount of time, while section 211(o)(9)(B) permits small refineries to petition for an extension of the exemption "at any time." EPA interprets these provisions of CAA section 211(o) to limit EPA to returning RINs retired for compliance, if any, when it grants an extension of the exemption. This determination has nationwide scope because it is an interpretation of a federal statute and CAA sections 211(o)(5) and 211(o)(9)(B) by their terms apply nationwide. Additionally, this determination has nationwide effect because it applies generically to all refineries nationwide, regardless of their geographic location.

This third determination also minimizes disruptions to the RIN market and RFS program, akin to the Fifth Circuit's review of the April 2022 Alternative Compliance Action[131] in *Wynnewood Refining Co., LLC v. EPA*, 86 F.4th 1114 (5th Cir. 2023). In *Wynnewood*, the Fifth Circuit concluded that the ACA was based on a determination of nationwide scope or effect because the ACA was designed to mitigate the impact of the collective denials from the April 2022 SRE Denial Action on the RIN market.[132] After denying 36 SRE petitions for the 2018 compliance year, EPA estimated that the small refineries would need to retire an additional 1.4

---

[130] CAA section 211(o)(9)(B).
[131] "April 2022 Alternative RFS Compliance Demonstration Approach for Certain Small Refineries," EPA–420–R–22–006, April 2022 ("ACA").
[132] *Wynnewood Refining Co., LLC v. EPA*, 86 F.4th 1114, 1119 (5th Cir. 2023).

billion RINs to satisfy their 2018 compliance obligations.[133] Concerned that such a drastic spike in need for RINs would threaten the viability of the RIN market, EPA issued the ACA, which required that the small refineries file a revised compliance report but did not require them to retire additional RINs.[134] The Fifth Circuit reasoned that, because the purpose of the ACA was to address the continuing viability of the RFS program as a whole, it was based on a determination of nationwide scope or effect.[135] Similarly here, EPA's determination that the only permissible means of implementing the extension of the exemption is by returning retired RINs is based on concerns about the integrity of the RFS program as a whole. As explained in Section IV.B, EPA estimates that, were the Agency to replace the retired RINs with current vintage RINs, it would introduce approximately 3 billion new RINs into the market. The sudden mass influx of new RINs would result in decreased RIN prices, leading to decreased future investments in renewable fuel production and threatening the stabity of the RIN market nationwide. EPA's approach of returning retired RINs is designed to avoid these negative impacts to the RFS program. Following the reasoning from the *Wynnewood* decision, because the purpose of this determination is to address the continuing viability of the RFS program as a whole, it is a determination of nationwide scope or effect.

The actions discussed within this document are based on the three determinations outlined above, as these determinations lie "at the core of the agency action[s]" so as to form the most important part of EPA's reasoning.[136] The first and second determinations together form the core basis for EPA's adjudications because the Agency has used both of them to create a rebuttable presumption that application of the DOE matrix produces the correct DEH finding, and EPA defers to that finding unless the Agency's consideration of other economic factors, including refinery-specific information, compels the Agency to depart from that rebuttable presumption. EPA's first determination is the first element of EPA's rebuttable presumption: because the DOE matrix can result in a finding of full DEH, partial DEH, or no DEH, EPA must first determine that the CAA provides the Agency with authority for finding partial DEH before the Agency can consider deferring to those findings. EPA's second determination is the second element of EPA's rebuttable presumption: the DOE matrix is a reasonable proxy for determining whether a small refinery would experience DEH, and deferring to that finding is the best way of fulfilling the Agency's statutory obligation to "consider the [2011 DOE Study]" and will result in the correct DEH finding for that small refinery. Taken together, these two determinations—that EPA has the authority to find that a small refinery is experiencing partial DEH and that the DOE matrix is a reasonable proxy for determining whether a small refinery would experience DEH— form the rebuttable presumption that is "the primary explanation for and driver of EPA's action."[137] Under this rebuttable presumption, EPA will defer to DOE's findings unless the Agency's consideration of other economic factors compels a different result.

To fulfill its statutory obligation to consider "other economic factors," EPA did consider refinery-specific information in its adjudications. However, these confirmatory reviews were not the primary drivers of EPA's actions on these petitions. EPA considered refinery-specific facts

---

[133] *Id.* at 1119-20.

[134] *Id.* at 1117, 1120.

[135] *Id.* at 1120.

[136] *Calumet*, 145 S. Ct. at 1751.

[137] *Id.*

only to determine whether to depart from its rebuttable presumption that application of DOE's matrix results in the correct DEH finding, and these considerations, for each small refinery, confirmed that none of the refinery-specific facts rebutted the presumptive disposition. For example, EPA considered information presented by small refineries regarding their financial circumstances and found that the information was already considered in the DOE matrix or did not otherwise justify departing from the finding reached by application of the DOE matrix. Thus, EPA's consideration of refinery-specific facts was peripheral in comparison to EPA's rebuttable presumption that application of the DOE matrix is the best means of determining whether DEH exists.[138] Notably, EPA's confirmatory review of refinery-specific facts did not change the final decision for any of the SRE petitions.

Additionally, EPA's third determination—that the only permissible way to implement the extension of the exemption from RFS obligations when a small refinery has retired RINs for compliance is to return those retired RINs—is a core driver of EPA's actions because EPA's adjudication of SRE petitions necessarily includes extending the exemption to meritorious petitioners. But how EPA effectuates that extension of the exemption can look different depending on whether the relevant small refinery has already demonstrated compliance with its relevant RFS obligations by retiring RINs. Generally, the RFS statutory and regulatory provisions require all obligated parties to comply with their RFS obligations. However, CAA section 211(o)(9)(B) provides an exception when a small refinery demonstrates that it would experience DEH. In other words, when EPA grants an exemption to a small refinery, that small refinery is not required to retire any RINs to demonstrate compliance if it is a full exemption, and only the number of RINs necessary to meet half of its RFS obligation if it is a partial exemption. However, simply granting a petition does not necessarily effectuate the exemption in all cases. If the exemption is granted prior to a compliance demonstration by the small refinery, then the exemption is self-implementing. But if the small refinery has already demonstrated compliance by retiring RINs, EPA needs to take an additional step to effectuate the exemption. For the reasons outlined in Section IV.B and in this Section V, EPA has determined, consistent with its interpretation of the Agency's authority under CAA section 211(o) and its policy interest in treating all refineries that receive an exemption equally, that returning the retired RINs is the only permissible way of implementing the exemption where a small refinery has previously demonstrated compliance with its RFS obligations by retiring RINs. EPA's adjudications are based on this determination because extending the exemption to meritorious petitioners is necessarily a part of EPA's action on the SRE petitions and EPA's statutory interpretation and policy considerations inform its implementation of the exemption for all petitioners.

For the reasons discussed above, EPA finds that the final actions discussed within this document are based on determinations of nationwide scope or effect for purposes of CAA section 307(b)(1) and is publishing that finding in the *Federal Register*. Under section 307(b)(1) of the CAA, petitions for judicial review of these actions must be filed in the D.C. Circuit within 60 days from the date notice of this document is published in the Federal Register.

---

[138] *Id.* at 1752.

## VII.  Update on Status of Certain SRE Petitions

In this document, we are articulating the status of 34 SRE petitions for the 2016–2018 compliance years. Thirty-one of these petitions (all for the 2018 compliance year) were initially granted in August 2019, while the remaining three petitions (for the 2016 and 2017 compliance years) were initially granted in individual decision documents in 2017 and 2018. We are not adjudicating these petitions in this document; instead, we rely on our prior actions to determine their status.

The three petitions granted for the 2016 and 2017 compliance years were challenged in *Renewable Fuels Association v. EPA*.[139] The Tenth Circuit entered judgment in 2020, vacating and remanding the decisions to EPA. In January 2021, the Supreme Court granted certiorari on the question of eligibility.[140] In June 2021, the Supreme Court held in *HollyFrontier* that the CAA does not require a continuous exemption and remanded the decision to the Tenth Circuit. In July 2021, the Tenth Circuit vacated its previous judgment, including the underlying *RFA* decision, and transferred the matter back to EPA.[141]

The 31 petitions granted for 2018 were challenged in the D.C. Circuit. In 2021, EPA requested a voluntary remand without vacatur of the decisions, which was granted in December 2021,[142] resulting in the decisions being remanded to EPA without vacatur in December 2021.[143]

In the April 2022 SRE Denial Action, EPA denied the 34 remanded SRE petitions discussed in this section. The D.C. Circuit vacated 32 of those denials (29 2018 petitions and three 2016–2017 petitions) in *Sinclair IV* and remanded the decisions to EPA.[144] Therefore, these 32 petitions are back before EPA. Because the 29 2018 petitions were originally remanded without vacatur, we understand the status of those petitions to be granted as initially decided in 2019. Additionally, because the judgment invalidating the grant of the three 2016–2017 petitions was vacated, those petitions are also understood to be granted as initially decided in 2017 and 2018.

---

[139] *Renewable Fuels Association v. EPA*, 948 F.3d 1206 (10th Cir. 2020) ("*RFA*").

[140] *HollyFrontier*, 141 S. Ct. 974 (January 8, 2021).

[141] *Renewable Fuels Association v. US EPA*, U.S. App. LEXIS 40113 (July 27, 2021).

[142] Order, *Sinclair Wyoming v. EPA*, No. 19-1196 (December 8, 2021) (*"Sinclair II"*).

[143] In this document, we are choosing to adjudicate the five 2018 SRE petitions that were initially denied in August 2019 and also remanded to EPA without vacatur by the D.C. Circuit in December 2021.

[144] The remaining two 2018 SRE petitions were also denied in the April 2022 SRE Denial Action on the alternative grounds that the refineries were ineligible to petition for an SRE. The D.C. Circuit upheld EPA's denial of these two petitions in *Sinclair IV* and thus the petitions remain denied.

# Exhibit B



summaries, and direct links to the documents. Go to *https://www.ferc.gov/ferc-online/overview* to register for eSubscription.

Dated: August 22, 2025.

**Debbie-Anne A. Reese,**
*Secretary.*

[FR Doc. 2025–16410 Filed 8–26–25; 8:45 am]

**BILLING CODE 6717–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

[FRL–12935–01–OAR]

## Notice of August 2025 Decisions on Petitions for Small Refinery Exemptions Under the Renewable Fuel Standard Program

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Decision on petitions.

**SUMMARY:** The Environmental Protection Agency (EPA) is providing notice of its final action entitled August 2025 Decision on Petitions for RFS Small Refinery Exemptions ("August 2025 SRE Decisions Action") in which EPA issued decisions on 175 small refinery exemption (SRE) petitions under the Renewable Fuel Standard (RFS) program. EPA is providing this notice for public awareness of, and the basis for, EPA's decision announced on August 22, 2025.

**DATES:** August 27, 2025.

**FOR FURTHER INFORMATION CONTACT:**
Campbell Martin, Office of Transportation and Air Quality, Environmental Protection Agency, 1200 Pennsylvania Avenue NW, Washington, DC 20004; telephone number: (202) 564–5209; email address: *SRE-Petitions@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background and Final Action

The Clean Air Act (CAA) provides that a small refinery[1] may at any time petition EPA for an extension of the exemption from the obligations of the RFS program for the reason of disproportionate economic hardship (DEH).[2] In evaluating such petitions, the EPA Administrator, in consultation with the Secretary of Energy, will consider the findings of a Department of Energy (DOE) study and other economic factors.[3]

In the August 2025 SRE Decisions Action,[4] EPA is acting on 175 individual SRE petitions from 38 refineries seeking an exemption from their RFS obligations for the 2016–2024 compliance years. In consultation with DOE, EPA reviewed all the information submitted by each individual refinery in support of its petition. After careful consideration of all statutory factors and the information submitted by the refineries, EPA is granting full (100 percent) exemptions to 63 petitions, granting partial (50 percent) exemptions to 77 petitions, denying 28 petitions, and determining 7 petitions to be ineligible.

The August 2025 SRE Decisions Action articulates EPA's interpretation of section 211(o)(9) of the CAA and EPA's authority with respect to SRE petitions. As required by CAA section 211(o)(9), EPA's final actions on the pending SRE petitions are based on the legal and factual analysis presented herein, after consulting with DOE, and considering the DOE Small Refinery Study and "other economic factors."

The August 2025 SRE Decisions Action also explains how EPA will implement SRE decisions when an exemption is granted. In addition, the August 2025 SRE Decisions Action articulates the status of 34 SRE petitions from 31 refineries for the 2016–2018 compliance years.

## II. Judicial Review

Section 307(b)(1) of the CAA governs judicial review of final actions by EPA. This section generally provides that petitions for judicial review of final actions that are nationally applicable must be filed in the United States Court of Appeals for the District of Columbia Circuit, and petitions for judicial review of actions that are locally or regionally applicable must be filed in the appropriate regional circuit.[5] However, petitions for judicial review of a final action that is locally or regionally applicable must be filed in the D.C. Circuit when "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination."[6]

As the Supreme Court recently articulated in *Calumet,* the first step in determining the appropriate venue for judicial review of an EPA final action is to ascertain whether the action at issue

is nationally applicable or locally or regionally applicable.[7] If the action is nationally applicable, judicial review belongs in the D.C. Circuit. If the action is locally or regionally applicable, then the second step is to determine whether EPA has appropriately invoked the "nationwide scope or effect" exception to "override the default rule" that judicial review of a locally or regionally applicable action belongs in the appropriate regional circuit.[8] The exception applies, and judicial review of EPA's action belongs in the D.C. Circuit, if EPA invokes the exception for a final action that is "based on a determination of nationwide scope or effect" and accompanied by an EPA finding of this basis.[9] A determination is "the justification [EPA] gives for it[s] action, which can be found in its explanation of its action."[10] A determination has a nationwide scope when it applies throughout the country as a legal matter, and it has a nationwide effect when it applies throughout the country as a practical matter.[11] Finally, an action is "based on" a determination of nationwide scope or effect when the determination "lie[s] at the core of the agency action," so as to form the most important part of the agency's reasoning.[12] Put another way, an EPA action is based on a determination of nationwide scope or effect "only if a justification of nationwide breadth is the primary explanation for and driver of EPA's action."[13]

In the August 2025 SRE Decisions Action, EPA is adjudicating SRE petitions pursuant to the authority granted to the Agency by CAA section 211(o)(9)(B). Each adjudication is a separate "action" for the purposes of determining venue under CAA section 307(b)(1), and because each adjudication only applies to a single refinery, each action is locally or regionally applicable.[14] However, EPA's adjudication of the relevant petitions is based on several determinations of nationwide scope or effect that formed the core basis for the Agency's decision.

First, these adjudications are based on EPA's determination that CAA section 211(o)(9) provides EPA with the authority to find that a small refinery would experience partial DEH if required to comply with its RFS

---

[1] The CAA defines a small refinery as "a refinery for which the average aggregate daily crude oil throughput for a calendar year . . . does not exceed 75,000 barrels." CAA section 211(o)(1)(K).

[2] CAA section 211(o)(9)(B)(i).

[3] CAA section 211(o)(9)(B)(ii).

[4] EPA, "August 2025 Decision on Petitions for RFS Small Refinery Exemptions," EPA–420–R–25–010, August 2025.

[5] CAA section 307(b)(1).

[6] *Id.*

[7] *Calumet,* 145 S. Ct. at 1746.

[8] *Id.* at 1746.

[9] *Id.* at 1749–50.

[10] *Id.* at 1750 (internal quotations omitted).

[11] *Id.*

[12] *Id.* at 1751.

[13] *Id.*

[14] *Id.* at 1748.

obligations and to extend a partial exemption. As detailed in Section III.H, CAA section 211(o)(9)(B) grants EPA authority to temporarily extend the exemption from RFS obligations to a small refinery that demonstrates "disproportionate economic hardship," but the statute does not define that phrase or its components, suggesting Congress left it to the Agency's discretion to "fill up the details" when determining how to implement this provision.[15] EPA interprets CAA section 211(o)(9)(B), based on the plain language, structure, and objective of the statute, to provide the Agency with the authority to find that a small refinery would experience partial DEH and to extend a partial exemption. This determination has nationwide scope because it is an interpretation of a federal statute and CAA section 211(o)(9)(B)(i) by its terms applies nationwide.[16] Additionally, this determination has nationwide effect because it applies generically to all refineries nationwide, regardless of their geographic location.[17]

Second, these adjudications are based on EPA's determination that the DOE matrix is a reasonable proxy for DEH, and EPA will defer to DOE's findings unless EPA's consideration of other economic factors compels a different result. As detailed in Section III.E, CAA section 211(o)(9)(B) permits a small refinery to petition for an extension of the exemption from its RFS obligations for the reason of DEH. The statute directs EPA to "consider the findings of the [2011 DOE study] and other economic factors" in evaluating a petition but provides no further instruction as to how to effectuate these obligations.[18] As the author of the study and through its work assessing SRE petitions in conjunction with EPA, DOE has developed extensive expertise in evaluating economic conditions at U.S. refineries that is fundamental to the process both DOE and EPA use to identify whether DEH exists for each petitioner. With limited exceptions, EPA has consistently relied upon DOE's expertise in the Agency's adjudication of SRE petitions over the life of the RFS program. Thus, EPA has determined that the best way to fulfill its obligation to "consider the findings of the [2011 DOE study]" under CAA section 211(o)(9)(B) is to defer to DOE's application of its matrix and resulting findings in evaluating whether a small

refinery would experience DEH. EPA has further determined that the best way to fulfill its obligation to consider "other economic factors" is to independently assess all available information and weigh whether this information compels EPA to depart from DOE's findings. This determination has nationwide scope because it is both an interpretation of a federal statute and CAA section 211(o)(9)(B)(i) by its terms applies nationwide, and it is a rebuttable presumption that DOE's finding as to whether a given small refinery would experience DEH, based on application of the DOE matrix, is correct, unless EPA's consideration of other economic factors compels it to depart from DOE's findings. Additionally, this determination has nationwide effect because it applies generically to all refineries nationwide, regardless of their geographic location.

Third, these adjudications are based on EPA's determination that, when extending the exemption, either wholly or partially, to a small refinery that has already retired RINs to comply with its RFS obligations, CAA section 211(o) restricts EPA to returning some or all of those retired RINs, commensurate with the degree of the exemption. As detailed in Section IV.B, returning RINs in this manner effectuates the best reading of the statute. CAA section 211(o)(5) requires that every instance of RIN generation be associated with the refining, blending, or importation of renewable fuel. Section 211(o)(5) also requires that RINs expire after a certain amount of time, while section 211(o)(9)(B) permits small refineries to petition for an extension of the exemption "at any time." EPA interprets these provisions of CAA section 211(o) to limit EPA to returning RINs retired for compliance, if any, when it grants an extension of the exemption. This determination has nationwide scope because it is an interpretation of a federal statute and CAA sections 211(o)(5) and 211(o)(9)(B) by their terms apply nationwide. Additionally, this determination has nationwide effect because it applies generically to all refineries nationwide, regardless of their geographic location.

This third determination also minimizes disruptions to the RIN market and RFS program, akin to the Fifth Circuit's review of the April 2022 Alternative Compliance Action[19] in *Wynnewood Refining Co., LLC* v. *EPA,* 86 F.4th 1114 (5th Cir. 2023). In

*Wynnewood,* the Fifth Circuit concluded that the ACA was based on a determination of nationwide scope or effect because the ACA was designed to mitigate the impact of the collective denials from the April 2022 SRE Denial Action on the RIN market.[20] After denying 36 SRE petitions for the 2018 compliance year, EPA estimated that the small refineries would need to retire an additional 1.4 billion RINs to satisfy their 2018 compliance obligations.[21] Concerned that such a drastic spike in need for RINs would threaten the viability of the RIN market, EPA issued the ACA, which required that the small refineries file a revised compliance report but did not require them to retire additional RINs.[22] The Fifth Circuit reasoned that, because the purpose of the ACA was to address the continuing viability of the RFS program as a whole, it was based on a determination of nationwide scope or effect.[23] Similarly here, EPA's determination that the only permissible means of implementing the extension of the exemption is by returning retired RINs is based on concerns about the integrity of the RFS program as a whole. As explained in Section IV.B, EPA estimates that, were the Agency to replace the retired RINs with current vintage RINs, it would introduce approximately 3 billion new RINs into the market. The sudden mass influx of new RINs would result in decreased RIN prices, leading to decreased future investments in renewable fuel production and threatening the stability of the RIN market nationwide. EPA's approach of returning retired RINs is designed to avoid these negative impacts to the RFS program. Following the reasoning from the *Wynnewood* decision, because the purpose of this determination is to address the continuing viability of the RFS program as a whole, it is a determination of nationwide scope or effect.

The actions discussed within the August 2025 SRE Decisions Action are based on the three determinations outlined above, as these determinations lie "at the core of the agency action[s]" so as to form the most important part of EPA's reasoning.[24] The first and second determinations together form the core basis for EPA's adjudications because the Agency has used both of them to create a rebuttable presumption that application of the DOE matrix produces

[15] *Loper Bright Enters.* v. *Raimondo,* 603 U.S. 369, 394–95.

[16] *Calumet,* 145 S. Ct. at 1752.

[17] *Id.*

[18] CAA section 211(o)(9)(B).

[19] "April 2022 Alternative RFS Compliance Demonstration Approach for Certain Small Refineries," EPA–420–R–22–006, April 2022 ("ACA").

[20] *Wynnewood Refining, LLC* v. *EPA,* 86 F.4th 1114, 1119 (5th Cir. 2023).

[21] *Id.* at 1119–20.

[22] *Id.* at 1117, 1120.

[23] *Id.* at 1120.

[24] *Calumet,* 145 S. Ct. at 1751.

the correct DEH finding, and EPA defers to that finding unless the Agency's consideration of other economic factors, including refinery-specific information, compels the Agency to depart from that rebuttable presumption. EPA's first determination is the first element of EPA's rebuttable presumption: because the DOE matrix can result in a finding of full DEH, partial DEH, or no DEH, EPA must first determine that the CAA provides the Agency with authority for finding partial DEH before the Agency can consider deferring to those findings. EPA's second determination is the second element of EPA's rebuttable presumption: the DOE matrix is a reasonable proxy for determining whether a small refinery would experience DEH, and deferring to that finding is the best way of fulfilling the Agency's statutory obligation to "consider the [2011 DOE Study]" and will result in the correct DEH finding for that small refinery. Taken together, these two determinations—that EPA has the authority to find that a small refinery is experiencing partial DEH and that the DOE matrix is a reasonable proxy for determining whether a small refinery would experience DEH—form the rebuttable presumption that is "the primary explanation for and driver of EPA's action." [25] Under this rebuttable presumption, EPA will defer to DOE's findings unless the Agency's consideration of other economic factors compels a different result.

To fulfill its statutory obligation to consider "other economic factors," EPA did consider refinery-specific information in its adjudications. However, these confirmatory reviews were not the primary drivers of EPA's actions on these petitions. EPA considered refinery-specific facts only to determine whether to depart from its rebuttable presumption that application of DOE's matrix results in the correct DEH finding, and these considerations, for each small refinery, confirmed that none of the refinery-specific facts rebutted the presumptive disposition. For example, EPA considered information presented by small refineries regarding their financial circumstances and found that the information was already considered in the DOE matrix or did not otherwise justify departing from the finding reached by application of the DOE matrix. Thus, EPA's consideration of refinery-specific facts was peripheral in comparison to EPA's rebuttable presumption that application of the DOE matrix is the best means of

determining whether DEH exists. [26] Notably, EPA's confirmatory review of refinery-specific facts did not change the final decision for any of the SRE petitions.

Additionally, EPA's third determination—that the only permissible way to implement the extension of the exemption from RFS obligations when a small refinery has retired RINs for compliance is to return those retired RINs—is a core driver of EPA's actions because EPA's adjudication of SRE petitions necessarily includes extending the exemption to meritorious petitioners. But how EPA effectuates that extension of the exemption can look different depending on whether the relevant small refinery has already demonstrated compliance with its relevant RFS obligations by retiring RINs. Generally, the RFS statutory and regulatory provisions require all obligated parties to comply with their RFS obligations. However, CAA section 211(o)(9)(B) provides an exception when a small refinery demonstrates that it would experience DEH. In other words, when EPA grants an exemption to a small refinery, that small refinery is not required to retire any RINs to demonstrate compliance if it is a full exemption, and only the number of RINs necessary to meet half of its RFS obligation if it is a partial exemption. However, simply granting a petition does not necessarily effectuate the exemption in all cases. If the exemption is granted prior to a compliance demonstration by the small refinery, then the exemption is self-implementing. But if the small refinery has already demonstrated compliance by retiring RINs, EPA needs to take an additional step to effectuate the exemption. For the reasons outlined in Section IV.B and in this Section V, EPA has determined, consistent with its interpretation of the Agency's authority under CAA section 211(o) and its policy interest in treating all refineries that receive an exemption equally, that returning the retired RINs is the only permissible way of implementing the exemption where a small refinery has previously demonstrated compliance with its RFS obligations by retiring RINs. EPA's adjudications are based on this determination because extending the exemption to meritorious petitioners is necessarily a part of EPA's action on the SRE petitions and EPA's statutory interpretation and policy considerations inform its implementation of the exemption for all petitioners.

For the reasons discussed above, EPA finds that the final actions discussed within the August 2025 SRE Decisions Action are based on determinations of nationwide scope or effect for purposes of CAA section 307(b)(1) and is publishing that finding in the **Federal Register**. Under section 307(b)(1) of the CAA, petitions for judicial review of these actions must be filed in the D.C. Circuit by October 27, 2025.

**Aaron Szabo,**
*Assistant Administrator, Office of Air and Radiation.*

[FR Doc. 2025–16390 Filed 8–26–25; 8:45 am]

**BILLING CODE 6560–50–P**

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OPP–2025–0295; FRL–12946–01–OCSPP]**

## Pesticide Experimental Use Permit; Receipt of Application; Comment Request (May 2025)

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

**SUMMARY:** This notice announces EPA's receipt of an application 102306–EUP–R from Synvect, Inc. 505 Coast Blvd., Suite 210, La Jolla, CA 92037, requesting an experimental use permit (EUP) for the *Streptococcus pyogenes* Cas9 (SpCas9) protein. The Agency has determined that the permit may be of regional and national significance. Therefore, because of the potential significance, EPA is seeking comments on this application.

**DATES:** Comments must be received on or before September 26, 2025.

**ADDRESSES:** Submit your comments, identified by docket identification (ID) number EPA–HQ–OPP–2025–0295, through the *Federal eRulemaking Portal* at *https://www.regulations.gov*. Follow the online instructions for submitting comments. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Additional instructions on commenting and visiting the docket, along with more information about dockets generally, is available at *https://www.epa.gov/dockets*.

**FOR FURTHER INFORMATION CONTACT:** Each application summary in Unit II. specifies a contact division. The appropriate division contacts are identified as follows:

• BPPD (Biopesticides and Pollution Prevention Division) (Mail Code 7511M); Shannon Borges; main

---

[25] *Id.*

[26] *Id.* at 1752.

# EXHIBIT C

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| WYOMING REFINING COMPANY, <br><br>           Petitioner, <br><br>    v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, <br><br>           Respondent. | Case No. _____ |

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner Wyoming Refining Company provides the following corporate disclosure statement:

Wyoming Refining Company is a trade name for Hermes Consolidated, LLC, a limited liability company organized under the laws of Delaware, doing business as Wyoming Refining Company. Wyoming Refining Company is a refiner of petroleum products. Wyoming Refining Company is an indirect wholly owned subsidiary of Par Pacific Holdings, Inc., a publicly held corporation. BlackRock, Inc., pursuant to its recent 13F filing, reported that it or funds or accounts managed by it, owns more than 10% of Par Pacific Holding's stock; no other publicly held company has a 10% or greater ownership interest in it.

Petitioner will file a revised corporate disclosure statement should it become aware of a change in corporate ownership interests that would affect the disclosures required by Rule 26.1.

Dated: October 27, 2025        Respectfully submitted,

                                    *s/ Michael R. Huston*

LeAnn Johnson Koch               Michael R. Huston
Alexandra Magill Bromer         Karl J. Worsham
PERKINS COIE LLP                  PERKINS COIE LLP
700 Thirteenth Street, N.W.,       2525 East Camelback Road,
Suite 800                          Suite 500
Washington, D.C. 20005-3960     Phoenix, AZ 85016
Telephone: 202.654.6297         Telephone: 602.351.8000
Facsimile: 202.654.6211          Facsimile: 602.648.7000
Leannjohnson@perkinscoie.com   MHuston@perkinscoie.com
ABromer@perkinscoie.com         KWorsham@perkinscoie.com

                                    Attorneys for Wyoming Refining Company

## CERTIFICATE OF SERVICE

Pursuant to Federal Rules of Appellate Procedure 3(d), 15(c) and 25, D.C. Circuit Rules 15(a) and 25, and 40 C.F.R. § 23.12(a), I hereby certify that on October 27, 2025, I will cause copies of the foregoing Petition for Review to be served by certified mail, return receipt requested upon the following:

HON. LEE ZELDIN, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

CORRESPONDENCE CONTROL UNIT
Office of General Counsel (2311)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

HON. PAMELA BONDI
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

HON. ADMAN R.F. GUSTAFSON
Acting Assistant Attorney General
Environmental and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Dated:  October 27, 2025

*s/ Michael R. Huston*
Michael R. Huston
PERKINS COIE LLP
